Michael W. PARRISH, D.C. and William W. Ranney, Plaintiffs–Appellants,

v.

Richard LAMM, Governor, State of Colorado; State Board of Chiropractic Examiners, William Dold, D.C., Glen Hultgren, D.C., Richard Ratliff, D.C., William Newcomer and J. Eric Griffiths, D.C.; Colorado State Board of Dental Examiners; Colorado State Board of Nursing; Colorado State Board of Optometric Examiners; Colorado State Board of Physical Therapy; Colorado State Board of Psychologist Examiners; Colorado Department of Health; David J. Thomas, District Attorney, 1st Judicial District; Norman S. Early, Jr., District Attorney, 2nd Judicial District; Barney Iuppa, District Attorney, 4th Judicial District; Kurt Schulke, District Attorney, 5th Judicial District; Vic Reichman, District Attorney, 6th Judicial District; Reid Pixler, District Attorney, 7th Judicial District; Stuart Van Meveren, District Attorney, 8th Judicial District; Milton K. Blakey, District Attorney, 9th Judicial District; Gus Sandstrom, District Attorney, 10th Judicial District; Robert Larsen, District Attorney, 11th Judicial District; Douglas Primavera, District Attorney, 12th Judicial District; Gregory F. Long, District Attorney, 14th Judicial District; Garth Neischburg, District Attorney, 15th Judicial District; Gary R. Stork, District Attorney, 16th Judicial District; James F. Smith, District Attorney, 17th Judicial District; Robert Gallagher, Jr., District Attorney, 18th Judicial District; Stanley C. Peek, District Attorney, 19th Judicial District; Alexander M. Hunter, District Attorney, 20th Judicial District; William H. Kain, III, District Attorney, 21st Judicial District; Dean Johnson, District Attorney, 22nd Judicial District, Defendants–Appellees.

No. 86SA452.

Supreme Court of Colorado,
En Banc.

July 11, 1988.

1358

Roger W. Calton and Associates, Roger W. Calton, Laguna Niguel, Cal., Robert L. Russel, Colorado Springs, for plaintiffs-appellants.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Linda Baker, First Asst. Atty. Gen., Denver, for defendants-appellees.

VOLLACK, Justice.

In 1985 the General Assembly established the crime of abuse of health insurance by enacting House Bill No. 1333 as section 18–13–119, 8B C.R.S. (1986). Michael W. Parrish and William W. Ranney (appellants) are doctors of chiropractic practicing in Colorado who regularly used the telephone directory and other media to advertise their willingness to waive insurance payments of deductible and copayment fees in providing health care service to their patients. They brought a declaratory judgment action [1] against a number of parties (appellees) in Denver District Court challenging the constitutionality of section 18–13–119. They argued that the statute violated various provisions of the United States and Colorado Constitutions. The district court upheld the statute under the federal constitution but did not address its status under the state constitution. The appellants appeal directly to this court pursuant to section 13–4–110(1)(a), 6A C.R.S. (1987). We conclude that the statutory scheme created by House Bill No. 1333 violates neither the United States Constitution nor the Colorado Constitution, and therefore affirm the judgment of the district court.

## I.

### Facts

### A.

#### Background

This dispute centers about the health care industry and the insurance industry. Traditionally, insurors have not undertaken the obligation to pay the entire cost of a compensable injury. The insuror's obligation to pay does not usually arise until the cost of health care service exceeds a given amount known as the deductible. In addition, coverage does not usually extend to a fixed percentage of the cost of health care service in excess of the deductible amount, known as the copayment. The obligation to pay the deductible and the copayment to the health care provider in those cases falls on the insured patient.

Certain health care providers, however, decided as a regular business practice not to enforce their right to demand payment of the deductible and the copayment; instead, they agreed to accept the amount of insurance coverage as payment in full for their services. Many of these health care providers as a regular business practice advertised their willingness to waive these patient fees in telephone directories, news-

---

1. The appellants also sought injunctive relief, but agreed to withdraw that request in return for an early trial date.

papers, and other broadcast media. Members of the health insurance industry claimed that such practices by health care providers discouraged patients from using health care services responsibly by removing the economic burden of receiving care, which indirectly raised the cost of health insurance to all subscribers. They sought relief through the legislature in the form of House Bill No. 1333.

## B.

### House Bill No. 1333

In its progression through the legislature, House Bill No. 1333 underwent a number of revisions. When introduced, the bill was entitled: "An act concerning misleading advertising by health care providers relating to third party payments as grounds for disciplinary action." It defined as "misleading" the regular business practice of advertising a willingness to waive patient payment of deductibles and copayments, and subjected health care providers to professional discipline. Before the first house committee hearing, the bill was amended. The bill no longer defined the practice of advertising a waiver of patient fees as "misleading," although the practice remained as grounds for professional discipline.

The bill passed the house in this form but was amended prior to the senate committee hearing by striking everything but the enacting clause and by inserting language creating the crime of abuse of health insurance as a class one petty offense. Under the proposed senate amendment, a health care provider committed the crime of abuse of health insurance by knowingly accepting from the patient's insuror the amount of its insurance coverage without demanding that the patient pay the deductible and the copayment, or by knowingly submitting a fee to the patient's insuror which was greater than the fee the health care provider agreed to accept from the patient with the understanding of waiving the deductible or the copayment.[2] The regular business practice of waiving the deductible and copayment obligations also became grounds for professional discipline of health care providers.[3]

The title of the bill was further amended to reflect these changes. The title became: "An act concerning advertising by health care providers relating to third-party payments as grounds for disciplinary actions, and, in connection therewith, providing that certain business practices are illegal." With few changes, House Bill No. 1333 passed the senate in this form. The house concurred in the senate amendments and repassed the bill. It was signed by the governor and became effective July 1, 1985.[4]

---

2. As an example of the workings of section 18–13–119, if a given health insuror required the insured to pay the first $100 of any insurable claim plus 20% of any additional cost, and the total cost of a particular health care service equaled $1000, then the insured would owe the health care provider a deductible of $100 plus a copayment of $180 ( = 20% × $900), for a total of $280, while the health insuror would owe the health care provider the remaining $720. A health care provider in this example would violate section 18–13–119 either by waiving the patient's obligation to pay $280 as a regular business practice or by charging the health insuror more than $720.

3. *See* §§ 12–32–107(3), 12–33–117(1) & (2), 12–35–118, 12–36–117(1), 12–38–117(1), 12–40–118(1), 12–41–118(1), 12–43–111(1), 5 C.R.S. (1985); § 25–1–107(1)(*l*) (II.1), 11 C.R.S. (1987 Supp.).

4. **18–13–119. Health care providers—abuse of health insurance.** (1) The general assembly hereby finds, determines, and declares that:

(a) Business practices that have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans interfere with contractual obligations entered into between the insured and the insurer relating to such payments;

(b) Such interference is not in the public interest when it is conducted as a regular business practice because it has the effect of increasing health care costs by removing the incentive that copayments and deductibles create in making the consumer a cost-conscious purchaser of health care; and

(c) Advertising of such practices may aggravate the adverse financial and other impacts upon recipients of health care.

(2) Therefore, the general assembly declares that such business practices are illegal and that violation thereof or the advertising thereof shall be grounds for disciplinary ac-

## II.

### Claims Under the Colorado Constitution

The appellants argue that passage of House Bill No. 1333 violates sections 17 and 21 of article V of the Colorado Constitution. We do not agree.

### A.

### Section 17

■ Section 17 of article V of the Colorado Constitution provides that "no bill shall be so altered or amended on its passage through either house as to change its original purpose." The appellants argue that House Bill No. 1333 violates section 17 for two reasons: first, because the senate amended the original bill not through line-by-line reconsideration but by completely rewriting the bill; and second, because the original purpose of the bill was changed from prohibiting certain forms of advertising to prohibiting the regular business practice of waiving patient obligations to pay deductibles and copayments. The ap-

pellees argue that the original purpose of House Bill No. 1333 was not changed when the General Assembly amended the bill; rather, they claim, the General Assembly merely changed the means of accomplishing the original purpose of the bill.

The controlling reason behind section 17 is to prevent bills relating to one subject when introduced from afterwards being so amended as to relate to an entirely different subject. *People v. Brown,* 174 Colo. 513, 524, 485 P.2d 500, 506 (1971), *appeal dismissed,* 404 U.S. 1007, 92 S.Ct. 671, 30 L.Ed.2d 656 (1972). Subsequent amendments which merely extend the original purpose, however, are permissible by either body of the legislature, irrespective of the question as to the particular body in which the bill originated. *In re Amendments of Legislative Bills,* 19 Colo. 356, 360, 35 P. 917, 918 (1894). Section 17 also does not prohibit the legislature from amending a bill by changing the means of accomplishing the bill's original purpose. *Brown,* 174 Colo. at 524, 485 P.2d at 506.

tions. The general assembly further declares that nothing contained in this section shall be construed to otherwise prohibit advertising by health care providers.

(3) Except as otherwise provided in subsections (5) and (6) of this section, if the effect is to eliminate the need for payment by the patient of any required deductible or copayment applicable in the patient's health benefit plan, a person who provides health care commits abuse of health insurance if he knowingly:

(a) Accepts from any third-party payor, as payment in full for services rendered, the amount the third-party payor covers; or

(b) Submits a fee to a third-party payor which is higher than the fee he has agreed to accept from the insured patient with the understanding of waiving the required deductible or copayment.

(4) Abuse of health insurance is a class 1 petty offense.

(5)(a) Reimbursements made pursuant to articles 4 and 15 of title 26, C.R.S., federal medicare laws for inpatient hospitalization, and mental health services purchased in accordance with part 2 of article 1 of title 27, C.R.S., are exempt from the provisions of this section.

(b) Health care services are exempt from the provisions of this section if they are provided in accordance with a contract or agreement between an employer and an employee or employees and the contract includes, as a part of an employee's salary or employment

benefits, terms which authorize a practice which would otherwise be prohibited by subsection (3) of this section.

(6)(a) The waiver of any required deductible or copayment for charitable purposes is exempt from the provisions of subsection (3) of this section if:

(I) The person who provides the health care determines that the services are necessary for the immediate health and welfare of the patient; and

(II) The waiver is made on a case-by-case basis and the person who provides the health care determines that payment of the deductible or copayment would create a substantial financial hardship for the patient; and

(III) The waiver is not a regular business practice of the person who provides the health care.

(b) Any person who provides health care and who waives the deductible or copayment for more than one-fourth of his patients during any calendar year, excluding patients covered by subsection (5) of this section, or who advertises through newspapers, magazines, circulars, direct mail, directories, radio, television, or otherwise that he will accept from any third-party payor, as payment in full for services rendered, the amount the third-party payor covers shall be presumed to be engaged in waiving the deductible or copayment as a regular business practice.

In *Brown*, we upheld the constitutionality of Colorado's implied consent law. The defendant had challenged the statute on section 17 and other grounds. He argued that the bill as introduced related to the proposed misdemeanor of driving while ability impaired, while the bill as adopted related to implied consent of drivers to alcohol testing by the police.[5] We held that section 17 was not violated by subsequent amendment because the General Assembly had not changed the original purpose of the bill but merely the means of accomplishing its original purpose. *Brown*, 174 Colo. at 524, 485 P.2d at 506.

The purpose that the General Assembly sought to further in House Bill No. 1333 was not to regulate advertising but to prohibit regular business practice of waiving certain patient fees. Advertising was perceived by the legislature merely as the means of promoting the undesirable practice of waiving patient fees. That the General Assembly in the final version of House Bill No. 1333 decided to criminalize the practice of waiving these patient fees in addition to making the practice grounds for professional discipline does not so alter or amend its original purpose as to violate section 17. We therefore conclude under the rationale of *Brown* that House Bill No. 1333 does not violate section 17 of article V of the Colorado Constitution.

### B.

### Section 21

Section 21 of article V of the Colorado Constitution provides: "No bill, except general appropriation bills, shall be passed containing more than one subject, which shall be clearly expressed in its title...." The purposes of section 21 are: (1) to notify the public and legislators of pending bills so that all may participate in the legislative process; (2) to guarantee that each legislative proposal passes on its own merit; and (3) to enable the governor to consider each piece of legislation separately in determining whether to exercise veto power. *See In re House Bill No. 1353*, 738 P.2d 371, 372 (Colo.1987); *Colorado Gen. Assembly v. Lamm*, 704 P.2d 1371, 1383 (Colo.1985); *Catron v. Board of County Comm'rs*, 18 Colo. 553, 557, 33 P. 513, 514 (1893); 1A N. Singer, *Sutherland Statutory Construction* § 17.01, at 2–3 (4th ed. 1985). Section 21 thereby embodies two requirements: a single subject requirement and a clear expression requirement.

### 1.

### Single Subject Requirement

■ The appellants first claim that House Bill No. 1333 violates the single subject requirement of section 21. The two subjects alleged by the appellants are the regular business practice of advertising a willingness to waive certain patient fees, and the related but separate crime of abuse of health insurance. The appellees contend that there is a single subject to which all matters pertain, which is the regular business practice of waiving certain patient fees.

So long as the matters encompassed in the bill are necessarily or properly connected to each other rather than disconnected or incongruous, the single subject requirement of section 21 is not violated. *In re House Bill No. 1353*, 738 P.2d at 374. The two matters encompassed in House Bill No. 1333 are the regular business practice of waiving patient fees, and the advertising of such practices. These matters are properly connected, because the act of advertising is simply one means of alerting patients that a health care provider is willing to waive payment of deductibles and copayments. We conclude that House Bill No. 1333 contains only one subject, and, for that reason, does not violate the single subject requirement of section 21.

### 2.

### Clear Expression Requirement

■ The appellants also claim that House Bill No. 1333 violates the clear ex-

---

**5.** The implied consent bill as introduced was titled: "An act concerning the operation of vehicles, and relating to driving while under the influence of intoxicating liquors or drugs, or while any person's ability to operate a vehicle is impaired by alcohol." The bill as adopted was entitled: "An act concerning the operation of vehicles and relating to driving while under the influence of intoxicating liquor or drugs."

pression requirement of section 21. They argue that the title fails to express clearly the subject matter of the bill because it appears to relate solely to business practices of advertising, and gives no notice to health care providers who do not advertise that they may be engaging in criminal conduct. As such, they claim, a health care provider who did not advertise his willingness to waive these patient fees would be unaware that he could nevertheless be prosecuted under House Bill No. 1333 simply for engaging in the regular business practice of waiving patient fees.

The appellants point to the title of the bill in support of the argument that House Bill No. 1333 violates the clear expression requirement of section 21. The title of the bill is: "An act concerning advertising by health care providers relating to third-party payments as grounds for disciplinary actions, *and, in connection therewith, providing that certain business practices are illegal.*" (Emphasis added). The appellants argue that the phrase "and, in connection therewith, providing that certain business practices are illegal" modifies the words "advertising by health care providers." The appellees argue that such a grammatical construction is not compelled. Instead, they argue that this phrase modifies the words "third-party payments."

For the purpose of passing constitutional scrutiny under the clear expression requirement of section 21, particularity in the titling of bills " 'is neither necessary nor desirable; generality is commendable.' ... [I]f the legislation 'is *germane* to the general subject expressed in the title; if it is relevant and appropriate to such subject, ... it does not violate [the clear expression requirement of section 21 of article V] of the Constitution.'" *Tinsley v. Crespin,* 137 Colo. 302, 309, 324 P.2d 1033, 1037 (1958) (emphasis added) (quoting *H.L. Shaffer & Co. v. Prosser,* 99 Colo. 335, 339, 62 P.2d 1161, 1163 (1936)). The word "germane" means "closely allied," "appropriate," or "relevant." *Dahlin v. City & County of Denver,* 97 Colo. 239, 240, 48 P.2d 1013, 1013 (1935); *Roark v. People,* 79 Colo. 181, 185, 244 P. 909, 910 (1926).

The matter covered by legislation is to be "clearly," not dubiously or obscurely, indicated by the title. Its relation to the subject must not rest upon a merely possible or doubtful inference. The connection must be so obvious as that ingenious reasoning aided by superior rhetoric will not be necessary to reveal it. Such connection should be within the comprehension of the ordinary intellect as well as the trained legal mind. Nothing unreasonable in this respect is required, however; and a matter is clearly indicated by the title when it is *clearly germane* to the subject mentioned therein.

*In re Breene,* 14 Colo. 401, 406, 24 P. 3, 4 (1890) (emphasis in original).

An appropriate general title which is broad enough to include all the subordinate matters considered is safer and wiser than an enumeration of several subordinate matters in the title. *Edwards v. Denver & Rio Grande R.R. Co.,* 13 Colo. 59, 65, 21 P. 1011, 1013 (1889). Finally, section 21 should be liberally construed so as to avert the evils against which it is aimed and at the same time avoid unnecessarily obstructing legislation. *In re Breene,* 14 Colo. at 404, 24 P. at 3.

The legislation in House Bill No. 1333 pertains to the regular business practice of waiving patient fees and to the advertising of this practice. It is within the comprehension of the ordinary intellect that the phrase "certain business practices" modifies the words "third-party payments" in the title. Such a construction becomes evident when the bill is read in conjunction with the title. From this context, we can say with assurance that the title of House Bill No. 1333 is "clearly germane" to the subject of criminalizing the regular business practice of waiving patient fees. We therefore conclude that House Bill No. 1333 does not violate the clear expression requirement of section 21 of article V of the Colorado Constitution.

### III.

#### Claims Under the United States Constitution

The appellants argue that section 18–13–119 violates the free speech, due pro-

cess, and equal protection clauses of the United States Constitution.[6] In analyzing these claims, we remain mindful of a number of principles. A statute enjoys a presumption of constitutionality. *People v. Moore*, 674 P.2d 354, 357 (Colo.1984). A party who challenges the constitutionality of a statute bears the burden of proving its unconstitutionality beyond a reasonable doubt. *People v. Rowerdink*, 756 P.2d 986, 990 (Colo.1988). If a statute is capable of both constitutional and unconstitutional interpretations, then the constitutional interpretation must be adopted. *People v. Randall*, 711 P.2d 689, 692 (Colo.1985).

## A.

### Freedom of Speech

The appellants claim that section 18–13–119 violates their right to free speech under the first amendment of the United States Constitution and section 10 of article II of the Colorado Constitution.[7] Section 18–13–119 provides in pertinent part:

> (2) Therefore, the general assembly declares that [regular business practices that have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans] are illegal and that violation thereof *or the advertising thereof* shall be grounds for disciplinary actions. The general assembly further declares that nothing contained in this section shall be construed to otherwise prohibit advertising by health care providers.
>
> . . . .
>
> (6)(b) Any person who provides health care and who ... *advertises* through newspapers, magazines, circulars, direct mail, directories, radio, television, or otherwise that he will accept from any third-party payor, as payment in full for ser-

vices rendered, the amount the third-party payor covers shall be presumed to be engaged in waiving the deductible or co-payment as a regular business practice. 8B C.R.S. (1986) (emphasis added).

The appellees argue that these sections do not violate the appellants' right to free speech because the speech in question is commercial speech and because there is no constitutional right to engage in illegal conduct. The appellants concede that the speech in question is commercial speech, but nevertheless argue that the General Assembly may not subvert the free speech rights of its citizens merely by labeling the conduct criminal. They claim that their right to speak outweighs the state's police power to advance the economic goal of promoting efficient use of insurance resources. The district court found that these sections were a valid regulation of commercial speech, and that they were narrowly drawn to prohibit advertising pertaining solely to the regular business practice of waiving patient fees.

### 1.

### Free Speech Under the United States Constitution

■ The state's power to regulate speech depends on the distinction between commercial and noncommercial speech. *High Gear & Toke Shop v. Beacom*, 689 P.2d 624, 629 (Colo.1984). Commercial speech is "speech proposing a commercial transaction." *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980); *May v. People*, 636 P.2d 672, 675 n. 6 (Colo.1981); *see also Central Hudson Gas*, 447 U.S. at 561, 100 S.Ct. at 2348–49 (Commercial speech is "expression related solely to the economic interest of the speaker and its audience.");

---

6. The appellants also allege that the statute violates the contract clause of the constitution as well as the separation of powers doctrine. These arguments were neither briefed to this court nor discussed at oral argument, and we decline to address them.

7. The appellants also claim that section 18–13–119 violates their patients' right to receive this information. To the extent this represents an

overbreadth challenge to the statute, the claim is without merit. The overbreadth doctrine does not apply to commercial speech. *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S.Ct. 1186, 1192, 71 L.Ed.2d 362 (1982); *People v. Becker*, 759 P.2d 26, 30 (Colo.1988); *City of Englewood v. Hammes*, 671 P.2d 947, 950 (Colo.1983).

Comment, *Commercial Speech: A Proposed Definition*, 27 Howard L.J. 1015, 1023–27 (1984). The first amendment, as applied to the states through the fourteenth amendment, protects commercial speech from unwarranted governmental regulation. *Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council*, 425 U.S. 748, 761–62, 96 S.Ct. 1817, 1825–26, 48 L.Ed.2d 346 (1976). The constitution, however, "accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." *Central Hudson Gas*, 447 U.S. at 562–63, 100 S.Ct. at 2349–50; *High Gear & Toke Shop*, 689 P.2d at 629. The government may regulate or ban entirely commercial speech related to an illegal activity. *High Gear & Toke Shop*, 689 P.2d at 629; *Florida Businessmen for Free Enter. v. City of Hollywood*, 673 F.2d 1213, 1217 (11th Cir.1982). "Illegal activity" is not confined to *malum in se* crimes, but extends to conduct the legislature declares to be illegal. *See, e.g., Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388, 93 S.Ct. 2553, 2560, 37 L.Ed.2d 669 (1973).

■ A statute regulating commercial speech must satisfy the following four part test in order to pass constitutional scrutiny:

At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.

*Central Hudson Gas*, 447 U.S. at 566, 100 S.Ct. at 2351; *May*, 636 P.2d at 678.

In this case, whatever commercial speech may be implicated in advertising a willingness to engage in the regular business practice of waiving patient fees is not protected by the first amendment because it fails the first part of the *Central Hudson Gas* test. Although the speech in question is not misleading, it does not concern lawful activity. We therefore hold that section 18–13–119 may prohibit the constitutionally unprotected activity of advertising a willingness to engage in the regular business of waiving the deductible copayment without violating the appellants' right to free speech.[8]

### 2.

### Free Speech Under the Colorado Constitution

■ The appellants also argue that section 18–13–119 intrudes on speech protected by section 10 of article II of the Colorado Constitution. Section 10 provides broader protection for freedom of speech than does the first amendment to the United States Constitution. *People ex rel. Tooley v. Seven Thirty–Five East Colfax, Inc.*, 697 P.2d 348, 356 (Colo.1985). Section 10 provides: "No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty...." The restrictions on commercial speech are within its scope. *Williams v. City & County of Denver*, 622 P.2d 542, 546 (Colo. 1981).

In *High Gear & Toke Shop v. Beacom*, 689 P.2d 624 (Colo.1984), we rejected a due

---

**8.** The appellants claim that subsection (6)(b) would prohibit them from advertising the existence of a waiver on a case-by-case basis. Subsection (6)(b) provides that any health care provider

who advertises through newspapers, magazines, circulars, direct mail, directories, radio, television, or otherwise that he will accept from any third-party payor, as payment in full for services rendered, the amount the third-party payor covers shall be presumed to be engaged in waiving the deductible or copayment as a regular business practice.

§ 18–13–119, 8B C.R.S. (1986). A health care provider will not be presumed to be engaging in the regular business practice of waiving the deductible or copayment, however, if he or she merely advertises the existence of the possibility of a waiver on a case-by-case basis through an announcement such as "A waiver of deductible or copayment is available as permitted by law."

process challenge to the drug paraphernalia statute under both the Colorado and United States Constitutions. We held the statute to be neither overbroad nor vague because the statute "only affects commercial speech related to illegal activities," *id.* at 630, and therefore did not infringe upon constitutional rights, *id.* at 635. For the same reason, we conclude that section 18–13–119 does not infringe upon the appellants' freedom of speech under section 10 of article II of the Colorado Constitution.

## B.

### Void-for-Vagueness

Subsection (6)(a) creates an exemption for waivers of patient fees made "for charitable purposes." Subsection (6)(a) states:

The waiver of any required deductible or copayment *for charitable purposes* is exempt from the provisions of subsection (3) of this section if:

(I) The person who provides the health care determines that the services are necessary for *the immediate health and welfare* of the patient; and

(II) The waiver is made on a case-by-case basis and the person who provides the health care determines that payment of the deductible or copayment would create a *substantial financial hardship* for the patient; and

(III) The waiver is not a regular business practice of the person who provides the health care.

§ 18–13–119, 8B C.R.S. (1986) (emphasis added).

The appellants argue that the phrases "for charitable purposes," "the immediate health and welfare," and "substantial financial hardship" in subsection (6)(a) are unconstitutionally vague on their face, not only because they are elusive and undefined, but also because they represent subjective standards determined by individual sensitivities. They argue that the district court erred in concluding, under the analysis of *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (*Flipside* ), that the statute should be accorded a less strict level of constitutional scrutiny, because at least one and possibly two of the four factors in *Flipside* favor the more strict vagueness test. The appellees argue that a less strict vagueness test should be applied, and that under that standard, the phrases in subsection (6)(a) are not vague. We agree with the district court's conclusion that section 18–13–119 should be scrutinized under the less strict *Flipside* vagueness test.

### 1.

### The *Flipside* Test

■■■ The level of scrutiny that a court must use in reviewing a vagueness challenge depends on the nature of the enactment. *Flipside,* 455 U.S. at 498, 102 S.Ct. at 1193. The nature of the enactment, in turn, depends on four factors. Those factors are:

(1) whether the statute is an economic regulation;

(2) whether the statute imposes civil or criminal penalties;

(3) whether the statute contains a scienter requirement; and

(4) whether the statute threatens to inhibit the exercise of constitutionally protected rights.

*Id.* at 498–99, 102 S.Ct. at 1193–94; *High Gear & Toke Shop,* 689 P.2d at 631.

A less strict vagueness test applies when the statute is an economic regulation, when the statute imposes civil penalties, or when the statute contains a scienter requirement. By contrast, a more strict vagueness test applies when the statute imposes criminal penalties. Perhaps the most important factor is whether the statute threatens to inhibit the exercise of constitutionally protected rights. If it does, then a more strict test applies; if it does not, then a less strict test applies. *Flipside,* 455 U.S. at 498–99, 102 S.Ct. at 1193–94.

■■■ The district court found that the statute was an economic regulation, that it imposed criminal penalties, that it contained a scienter requirement, and that it did not threaten to inhibit the exercise of constitutionally protected rights because the prohibition against advertising extend-

ed solely to commercial speech that the General Assembly had declared to be illegal. It then analyzed the challenged phrases of subsection (6)(a) under the less strict *Flipside* vagueness test and concluded that the phrases were sufficiently clear that persons of ordinary intelligence could readily understand their meaning and application.

The appellants argue that the more strict *Flipside* vagueness test applies. They insist that the more strict test applies when any of the four *Flipside* factors favors the more strict test. They also claim that the fourth and most important *Flipside* factor favors application of the more strict vagueness test.

The standards for evaluating a vagueness challenge should not be applied mechanically. *Flipside*, 455 U.S. at 498, 102 S.Ct. at 1193. Therefore, a mere tally of the four *Flipside* factors will not suffice. At the same time, the mere indication that one of the first three factors favors the more strict vagueness test does not compel the conclusion that the more strict vagueness test applies. Because the fourth *Flipside* factor is the most important to consider, we turn to it first.

If section 18–13–119 interferes with the right of free speech or association, for example, then the more stringent vagueness test applies. *Id.* Yet, as we stated in Part III.A.1, section 18–13–119 does not interfere with the right of free speech because the speech in question is commercial speech directed at activity the legislature declared to be illegal. In addition, subsection (2) states that "nothing contained in this section shall be construed to otherwise prohibit advertising by health care providers." This restriction on the scope of the prohibition against advertising shows that the statute is narrowly tailored, and reinforces the notion that section 18–13–119 does not inhibit the exercise of constitutionally protected rights. As a result, the fourth *Flipside* factor militates in favor of the less strict vagueness test.

Two of the first three *Flipside* factors also favor the less strict vagueness test. Section 18–13–119 is an economic regulation. It requires a health care provider to act "knowingly," thereby showing that the statute contains a scienter requirement. The statute provides for criminal penalties, however, so the second *Flipside* factor favors the more strict vagueness test.[9] Because the most important factor as well as two of the remaining three factors weigh in favor of the less strict vagueness test, we conclude that the phrases in subsection (6)(a) will be measured under the less strict vagueness test.

### 2.

#### Fair Warning of Prohibited Conduct

A statute whose terms are unduly vague violates the due process clause of the fourteenth amendment. *Flipside*, 455 U.S. at 497, 102 S.Ct. at 1192–93. To succeed in a vagueness challenge, the complaining party must show that the statute is impermissibly vague in all of its applications. *Id.* In *Eckley v. Colorado Real Estate Commission*, 752 P.2d 68 (Colo. 1988), we stated the standards and competing interests that underlie a void-for-vagueness challenge:

A statute offends due process of law, however, if it is so vague that it does not provide fair warning of the conduct prohibited or if its standards are so ill-defined as to create a danger of arbitrary and capricious enforcement. *E.g., Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed. 2d 110 (1972); *Exotic Coins, Inc. v. Beacom*, 699 P.2d 930, 943 (Colo.1985), *appeal dismissed*, 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 214 (1985). A statute is not void for vagueness if it fairly describes the conduct forbidden, and persons of common intelligence can readily understand its meaning and application. *E.g., Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926); *People v. O'Cana,*

---

**9.** The penalty for conviction of the crime of abuse of health insurance, a class one petty offense, is a fine of not more than $500, or imprisonment for not more than six months other than in the correctional facilities at Canon City, or both. § 18–1–107, 8B C.R.S. (1986).

725 P.2d [1139] at 1141 [ (Colo.1986) ]; *Exotic Coins, Inc.,* 699 P.2d at 943.

The vagueness test "is not an exercise in semantics to emasculate legislation; rather, it is a pragmatic test to ensure fairness." *People v. Sequin,* 199 Colo. 381, 388, 609 P.2d 622, 627 (1980). *Accord, e.g., People v. Revello,* 735 P.2d 487, 490 (Colo.1987). Statutory terms need not be defined with mathematical precision in order to pass constitutional muster. *Exotic Coins Inc.,* 699 P.2d at 943. Instead, the statutory language must strike a balance between two potentially conflicting concerns: it must be specific enough to give fair warning of the prohibited conduct, yet must be sufficiently general to address the problem under varied circumstances and during changing times. *E.g., Kibler v. State,* 718 P.2d 531, 534 (Colo.1986); *Colorado Auto & Truck Wreckers Ass'n v. Dep't of Revenue,* 618 P.2d 646, 651 (Colo. 1980).

*Eckley,* 752 P.2d at 73.

■ Statutory words and phrases should be given their ordinary and accepted meaning unless they have acquired a technical meaning through legislative definition or judicial construction. *Charnes v. Lobato,* 743 P.2d 27, 30 (Colo.1987); *Binkley v. People,* 716 P.2d 1111, 1113 (Colo.1986); *see* § 2–4–101, 1B C.R.S. (1980). The phrases in subsection (6)(a) have not acquired a technical meaning under Colorado law,[10] so we will give them their ordinary and accepted meaning.

■ The word "charitable" means "generous in assistance to the poor." *Webster's Third New International Dictionary* 378 (1986). By implication, the "charitable purposes" described in subsection (6)(a) are limited to considerations of the ability of a particular patient to pay a required deductible or copayment. In that context, "the immediate health and wel-

fare" and "substantial financial hardship" are readily comprehensible to persons of common intelligence. A health care provider may be generous in assistance to the poor by waiving any required deductible or copayment on a case-by-case basis under subsection (6)(a) without violating subsection (3) so long as a determination is made that a patient needs treatment immediately yet can't afford to pay the deductible or copayment because the payment would create a substantial financial hardship for the patient.

Moreover, a clear designation of legislative intent can compensate for some imprecision in terms. *Exotic Coins, Inc. v. Beacom,* 699 P.2d 930, 944 (Colo.), *appeal dismissed,* 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 214 (1985). The general legislative intent behind section 18–13–119 is clearly expressed in subsection (1):

The general assembly hereby finds, determines, and declares that:

(a) Business practices that have the effect of eliminating the need for actual payment by the recipient of health care of required copayments and deductibles in health benefit plans interfere with contractual obligations entered into between the insured and the insurer relating to such payments;

(b) Such interference is not in the public interest when it is conducted as a regular business practice because it has the effect of increasing health care costs by removing the incentive that copayments and deductibles create in making the consumer a cost-conscious purchaser of health care; and

(c) Advertising of such practices may aggravate the adverse financial and other impacts upon recipients of health care.

§ 18–13–119, 8B C.R.S. (1986). We therefore conclude that, under the less strict *Flipside* vagueness test, the phrases "for charitable purposes," "the immediate

---

10. The word "charitable" has been examined in the context of determining whether an entity is a charitable corporation for purposes of obtaining a sales tax exemption. *Electric Power Research Inst. v. City & County of Denver,* 737 P.2d 822 (Colo.1987) (plurality opinion). We did not offer a judicial interpretation of the word "char-

itable," although we did characterize it as "enigmatic," and the endeavor to define it as "problematic" in view of "the vast array of beneficial activities presently undertaken by numerous entities to improve the conditions under which all citizens live...." *Id.* at 826.

health and welfare," and "substantial financial hardship" in subsection (6)(a) fairly describe the conduct permitted so that persons of common intelligence can readily understand their meaning and application. Therefore subsection (6)(a) is not unconstitutionally vague.

### 3.

### Danger of Arbitrary Enforcement

■ The appellants also argue that subsection (6)(a) is unconstitutionally vague because it creates the danger of arbitrary and discriminatory enforcement. They point out that the exemption under subsection (6)(a) applies only when the health care provider determines that a particular patient qualifies for a waiver. As such, they argue, the determination of whether a health care provider has complied with subsection (6)(a) depends on the subjective sensibilities of the health care provider rather than any objective standard.

The determinations under subsection (6)(a) depend on the individual sensibilities of the health care provider. Yet no one is in a better position than the health care provider to determine the immediate health needs of a given patient. Similarly, a health care provider is often called upon to evaluate the ability of his or her patients to pay for treatment. Nevertheless, statutes phrased in terms of individual sensibilities are susceptible to attack on vagueness grounds because of the danger of arbitrary and discriminatory enforcement. *See, e.g., Coates v. City of Cincinnati*, 402 U.S. 611, 613, 91 S.Ct. 1686, 1687–88, 29 L.Ed.2d 214 (1971).

If at all feasible, however, a statute must be construed so as to accomplish the purposes for which it was enacted. *Schubert v. People*, 698 P.2d 788, 793 (Colo.1985). Where that legislative purpose can be accomplished through a limiting construction that will make the terms of the statute constitutional, we will do so. *See May v. People*, 636 P.2d 672, 675–76 (Colo.1981); *Bolles v. People*, 189 Colo. 394, 398, 541 P.2d 80, 83 (1975). In this case, whatever constitutional infirmity may be created by the requirement under subsection (6)(a)

that the health care provider determine the patient's need for immediate care and his or her ability to pay can be rectified by narrowly construing the word "determines" as "reasonably determines." Under that interpretation, the issue of whether a particular health care provider violates subsection (6)(a) will be decided by comparing the conduct in question to the conduct of a reasonably prudent health care provider under the circumstances. Subject to this qualification, we conclude that the exemption contained in subsection (6)(a) does not create the danger of arbitrary and discriminatory enforcement and, for that reason, is not unconstitutionally vague.

### C.

### Equal Protection

The appellants claim that the patient classifications created by subsection (5) violate the appellants' right to equal protection of the laws. Subsection (5)(a) exempts reimbursements made to federal medicare patients under the Colorado Medical Assistance Act, sections 26–4–101 to ·–118, 8B C.R.S. (1986 & 1987 Supp.), and the Reform Act for the Provision of Health Care for the Medically Indigent, sections 26–15–101 to –113, 8B C.R.S. (1987 Supp.), as well as reimbursements for purchases of mental health services under sections 27–1–201 to –208, 8B C.R.S. (1986). Subsection (5)(b) exempts health care services provided under a 100% coverage health care plan provided by employers as part of the employee's salary or benefits.

The appellants, appellees, and the district court disagree as to the level of constitutional scrutiny that should be given these classifications, as well as the proper result of the test. The appellants argue that the strict scrutiny test applies because the classifications infringe upon the fundamental right of free speech. They believe the classifications are not necessary to achieve a compelling state interest because the economic justification of preventing increased health care costs by making patients cost-conscious purchasers of health care does not rise to the level of a compelling state interest. The appellees argue that the

strict scrutiny test does not apply because there is no fundamental right to express commercial speech concerning illegal conduct. They believe that the classifications should be measured under the rational basis test, and argue that the classifications are rationally related to a legitimate state objective. The district court held that the strict scrutiny test applied because the statute infringed upon the fundamental right of free speech. It found that the state objective in section 18–13–119 was a compelling state interest, and concluded that the classifications created by the statute did not violate the appellants' rights to equal protection of the laws under the strict scrutiny test.

The guarantees of equal protection under the Colorado and United States Constitutions require like treatment of persons who are similarly situated. *Tassian v. People*, 731 P.2d 672, 674 (Colo.1987). An equal protection challenge arises when the challenging party establishes that the statute treats similarly situated persons differently. *Id.* at 675. This must be determined as a threshold matter. *Bath v. Colorado Dep't of Revenue*, 758 P.2d 1381, at 1385 (Colo.1988).

The level of scrutiny given a statute treating similarly situated persons differently depends on the type of classification and the nature of the right affected. *Colorado Dep't of Social Servs. v. Board of County Comm'rs*, 697 P.2d 1, 13 (Colo.1985). *See generally* J. Nowak, R. Rotunda & J. Young, *Constitutional Law* 590–99 (2d ed. 1983).

 In equal protection cases, we follow the three-tiered standard of review established by the United States Supreme Court. Classifications that affect a suspect class or a fundamental right are subject to strict scrutiny. Strict scrutiny requires the government to establish that the classification is necessarily related to a compelling state interest. *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); *Austin v. Litvak*, 682 P.2d 41, 49 (Colo.1984). Classifications based on illegitimacy or alienage are subject to an intermediate

level of scrutiny. Under this standard, the government must establish that the classification is substantially related to an important governmental objective. *Clark v. Jeter*, — U.S. ——, 108 S.Ct. 1910, ——, 100 L.Ed.2d 465 (1988); *Craig v. Boren*, 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed. 2d 397 (1976); *Tassian*, 731 P.2d at 675.

All other classifications are subject to a rational basis standard of review. This is the most deferential standard of judicial review. Under this standard, classifications are presumed to be constitutional, and the party challenging the statute bears the burden of proving beyond a reasonable doubt that the classification is not rationally related to a legitimate state objective. *Lying v. International Union*, — U.S. ——, 108 S.Ct. 1184, 1193, 99 L.Ed.2d 380 (1988); *Austin*, 682 P.2d at 49; *Hurricane v. Kanover, Ltd.*, 651 P.2d 1218, 1222 (Colo.1982).

 The district court held that section 18–13–119 treated similarly situated persons differently. It also held that strict scrutiny was the appropriate standard to apply because the appellants had shown that the classifications created by subsection (5) interfered with the exercise of their fundamental right to free speech. We agree with the district court that subsection (5) treats some patients differently who are similarly situated. We also recognize that the right to free speech is a fundamental right. We disagree, however, that commercial speech relating to illegal conduct rises to the level of a fundamental right.

Commercial speech pertaining to illegal activity has not been accorded the status of a fundamental right. *See, e.g., Central Hudson Gas*, 447 U.S. at 566, 100 S.Ct. at 2351 (In order for commercial speech to come within the protection of the first amendment, "it at least must concern lawful activity and not be misleading."); *Pittsburgh Press*, 413 U.S. at 389, 93 S.Ct. at 2560–61 ("Any First Amendment interest which might be served by advertising an ordinary commercial proposal and which might arguably outweigh the governmental interest supporting the regulation is alto-

gether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity."); Barnes, *Commercial Speech Concerning Unlawful Conduct: A Clear and Present Danger*, 1984 B.Y.U.L. Rev. 457, 471–72. The district court appeared to assume that all statutes that affect freedom of speech are measured under the strict scrutiny standard, without considering the more relaxed standard of review accorded to infringements of commercial speech concerning conduct the legislature has declared to be illegal. Therefore, we conclude that the district court erred in applying the strict scrutiny test, and hold that the appropriate standard of review of section 18–13–119 is the rational basis test.

■ The appellants argue that section 18–13–119 fails even the rational basis test. Although they appear to concede that preventing increased health care costs by making patients cost-conscious purchasers of health care is a legitimate state objective, they contend that the exemptions of subsection (5) actually create economic incentives for patients not to act as cost-conscious health care consumers. They claim, for example, that the subsection (5)(a) exemption for health care provided to federal medicare patients receiving inpatient hospitalization service is deficient for two reasons: first, because the class is overinclusive, inasmuch as many federal medicare patients are elderly patients who are not indigent; and second, because it exempts inpatient hospitalization service but not the generally more economical outpatient service. The appellants claim that the subsection (5)(b) exemption for recipients of 100% coverage health care programs as part of their employment creates a class of patients who are not cost-conscious purchasers of health care service.

"Traditional equal protection does not require that every classification be drawn with precise 'mathematical nicety.' " *United States Dep't of Agric. v. Moreno*, 413 U.S. 528, 538, 93 S.Ct. 2821, 2827–28, 37 L.Ed.2d 782 (1973) (citing *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153,

1161–62, 25 L.Ed.2d 491 (1969)). Moreover, a statute is not constitutionally suspect simply because the classifications result in some inequality. *Dawson v. Public Employees' Retirement Ass'n*, 664 P.2d 702, 708 (Colo.1983). Finally, the statute is not required to solve all problems at once, but may "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); L. Tribe, *American Constitutional Law* § 16–4, at 1447, 1450 (2d ed. 1988).

The exemption for federal medicare patients appears to be overinclusive because it includes certain patients with the ability to pay the deductible and the copayment. Even so, we cannot say that the statute is not rationally related to the legitimate state objective it seeks to promote. In enacting section 18–13–119, the General Assembly addressed the problem of health care providers waiving patient fees for patients who can otherwise afford to pay; that problem is far less pressing when the patient is unable to pay the deductible or the copayment. Problems in the same field may be perceived by the legislature to be of different dimensions and proportions, requiring different remedies. *Tigner v. Texas*, 310 U.S. 141, 148, 60 S.Ct. 879, 882–83, 84 L.Ed. 1124 (1940). That many federal medicare patients are indigent is sufficient to demonstrate a rational basis for the classification created by the subsection (5)(a) exemption.

Similarly, a rational relationship exists for the subsection (5)(b) exemption. The General Assembly was concerned that some patients would irresponsibly demand an excessive number of treatments when they were not required to pay a deductible and copayment, and that such misuse would indirectly cause the cost of health care to rise for all health care purchasers. This concern is not implicated when a higher insurance premium is paid for the right to demand an unlimited number of treatments at no charge. Under 100% coverage health care plans, employers agree to pay higher insurance premiums in return for health care at no charge to their employ-

ees. Health insurors charge higher premiums under 100% coverage health care plans in part because they anticipate that some employees will demand an excessive number of treatments. For that reason, the cost attributable to receiving excessive numbers of treatments is confined to employers of the patients who receive these treatments, with the result that health care purchasers who are not under 100% coverage health care plans do not incur these indirect costs.

We therefore conclude that the district court erred in measuring the statute under the strict scrutiny test, but agree that, under the rational relationship test, section 18–13–119 does not deny the appellants the equal protection of the laws.

The judgment of the district court in all other respects is affirmed.