Lawrence M. ROBERTSON, Jr., M.D.; Sharon Deatherage; Jeffrey Hecht; and David Jewell, d/b/a Scotties Guns & Militaria, Plaintiffs–Appellees,

State of Colorado, ex rel. Duane Woodard, Plaintiff/Intervenor–Appellee,

v.

The CITY AND COUNTY OF DENVER; Ari Zavaras, Chief of Police of the City and County of Denver; and Manuel Martinez, Manager of Safety and Ex–Officio Sheriff of the City and County of Denver, Defendants–Appellants.

No. 93SA91.

Supreme Court of Colorado, En Banc.

May 2, 1994.

Ralph B. Rhodes, Denver, Stephen P. Halbrook, Fairfax, VA, for plaintiffs-appellees.

Gale Norton, Atty. Gen., Stephen K. ErkenBrack, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Shawn Mitchell, Sp. Counsel, Denver, for plaintiff, intervenor-appellee.

David B. Kopel, Golden, for plaintiffs.

Daniel Muse, City Atty., John L. Stoffel, Jr., Karen A. Aviles, Asst. City Attys., Denver, for defendants-appellants.

Felix L. Sparks, Lakewood, Chambers, Dansky and Hansen, David J. Dansky, Denver, for amici curiae Center to Prevent Handgun Violence, People United—No Children's Handguns, CO Chapter of American College of Emergency Physicians, CO Chapter of American College of Surgeons, Denver Medical Soc., CO Chapter of American Public Health Ass'n, CO Nurses Ass'n, CO Chapter of American Academy of Pediatrics, and Soc. of Critical Care Medicine.

A. William Ritter, Jr., Dist. Atty., Everett Engstrom, Deputy Dist. Atty., Denver, for amicus curiae Dist. Atty.

Robert Dowlut, Washington, DC, for amicus curiae Firearms Civil Rights Legal Defense Fund, Law Enforcement Alliance of America, CO State Shooting Ass'n, and Firearms Coalition of CO.

Wade H. Eldridge, P.C., Wade Eldridge, Denver, for amici curiae Intern. Wound Ballistics Ass'n, Doctors for Integrity in Research and Public Policy, CO Ass'n of Law Enforcement Firearms Instructors, Nat. Ass'n of Chiefs of Police, Congress of Racial Equality, American Federation of Police, Independence Institute, Second Amendment Foundation, and Veterans of Foreign Wars.

Chief Justice ROVIRA delivered the Opinion of the Court.

This case presents questions of whether an ordinance banning the manufacture, sale, or possession of "assault weapons" within the City and County of Denver violates article II, section 13 of the Colorado Constitution, and the constitutional proscription against laws that are impermissibly vague or overbroad.[1]

## I

In October 1989, the Denver City Council (City Council) enacted Ordinance No. 669 which became effective on November 14,

1. The Second Amendment to the United States Constitution is not implicated in this case. That amendment provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear Arms shall not be infringed."

1989, and was codified as section 38–130 of the Denver Revised Municipal Code. *See Appendix,* Denver, Colo., Rev.Mun.Code art. IV, § 38–130 (1989) (the ordinance).

The individual plaintiffs challenged the constitutionality of the ordinance on numerous grounds.[2] The attorney general intervened as a plaintiff-intervenor on behalf of the State of Colorado.[3] Subsequently, the trial court held a hearing to consider the plaintiffs' and defendants' motions for summary judgment.

The trial court granted plaintiffs' motion.[4] It concluded that article II, section 13 of the Colorado Constitution guarantees the people of Colorado the fundamental right to bear arms. It found that defendants had established a compelling governmental interest in regulating assault weapons, but that this interest was served only by banning those weapons capable of both a rapid rate of fire

and having the capacity to fire an inordinately large number of rounds without reloading. Thus, the court gave the ordinance a limiting construction so that it would serve the compelling interest defined by the court. The court additionally determined that certain provisions of the ordinance were vague or overbroad, and that those provisions were not severable from those which passed constitutional muster. Thus, the trial court invalidated the entire ordinance.[5]

Defendants appealed to this court pursuant to section 13–4–102(1)(b), 6A C.R.S. (1992 Supp.). We affirm in part, reverse in part, and remand the case for further proceedings.

## II

The right to bear arms is guaranteed under article II, section 13 of the Colorado Constitution.[6] That section provides:

---

**2.** Specifically, they argued the ordinance is unconstitutional because it: violates the right to bear arms provided in art. II, § 13 of the Colorado Constitution; the militia clause of art. XVII of the Colorado Constitution; equal protection of the laws under the Fourteenth Amendment to the United States Constitution and art. II, § 25 of the Colorado Constitution; is pre-empted by state law under article XX of the Colorado Constitution; constitutes an *ex post facto* law prohibited by art. II, § 11 of the Colorado Constitution; and is unconstitutionally vague and overbroad.

The trial court rejected the militia, equal protection, pre-emption, and *ex post facto* claims. These rulings have not been appealed and thus, are not before this court. *See infra* note 5.

**3.** The individual plaintiffs and the State of Colorado will be referred to collectively as "plaintiffs."

**4.** The trial court's order is lengthy. In the interest of clarity, the order is initially set forth only in its most basic form and a more detailed discussion and analysis is undertaken, as necessary, below.

**5.** The trial court made a number of rulings that have not been appealed. Defendants have sought review of the following issues:

I. Is the limited right to bear arms in the defense of home, person, and property a fundamental right?

II. Did the district court err in determining that the city's governmental interest was limited to regulating weapons with both a rapid rate of fire and a large magazine?

III. Did the district court improperly interpret the ordinance by limiting the prohibition of listed weapons of section 38–130(h) to only

those weapons also defined in section 38–130(b)(1) and by declaring the definition of assault pistol to be vague?

IV. Is the ordinance, which only restricts one type of weapon, overbroad because it unduly [in]fringes upon the limited right to bear arms for defensive purposes?

Defendants have not appealed, and do not argue that the trial court erred in concluding that § 38–130(h)(5) is void for vagueness. Thus, this issue is not before us. In addition, because plaintiffs have not filed a cross-appeal, allegations of error on the part of the trial court which are raised in their answer brief but not presented for this court's review by defendants are not properly before us (*i.e.,* that the ordinance violates the prohibition against *ex post facto* laws and is pre-empted by state statutes regulating firearms). *See Douglas County Bd. of Comm'rs v. Public Util. Comm'n,* 866 P.2d 919, 922, n. 4 (Colo.1994).

**6.** The Colorado Constitution, like the constitution of many other states, expressly guarantees the right to bear arms for purposes of self-defense and the defense of property. Four states have right to bear arms provisions which are identical to Colorado's. *Miss. Const.* art. III, § 12; *Mo. Const.* art. I, § 23; *Mont. Const.* art. II, § 12; and *Okla. Const.* art. II, § 26. The constitutions of twenty other states expressly guarantee individuals the right to bear arms for purposes of self-defense and thus, are closely analogous to the right guaranteed under the Colorado Constitution. *Ala. Const.* art. I, § 26; *Ariz. Const.* art. II, § 26; *Conn. Const.* art. I, § 15; *Del. Const.* art. I, § 20; *Fla. Const.* art. I, § 8; *Ind. Const.* art. I, § 32; *Ky. Const.* § I, para. 7; *Mich. Const.* art. I, § 6; *Neb. Const.* art. I, § 1; *N.H. Const.* pt.

The right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

Defendants argue that the trial court erred in concluding that this provision establishes a fundamental right to bear arms in self-defense.[7] *See Bowers v. Hardwick,* 478 U.S. 186, 191–92, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (identifying fundamental constitutional rights as those "implicit in the concept of ordered liberty" or "deeply rooted in this Nation's history or tradition"). Conversely, plaintiffs argue that the trial court correctly reached this conclusion.

While it is clear that this right is an important constitutional right, it is equally clear that this case does not require us to determine whether that right is fundamental. On several occasions, we have considered article II, section 13, yet we have never found it necessary to decide the status accorded that right. Rather, we have consistently concluded that the state may regulate the exercise of that right under its inherent police power so long as the exercise of that power is reasonable.

The earliest decision of this court applying article II, section 13, is *People v. Nakamura,* 99 Colo. 262, 62 P.2d 246 (1936). In *Nakamura,* we struck down a statute prohibiting unnaturalized foreign-born residents from owning or possessing a firearm of any kind, stating that while the state may preserve wild game and prevent the killing of the same by aliens, "it cannot disarm any class of persons or deprive them of the right guaranteed under section 13, article II of the Constitution, to bear arms in defense of home, person and property." *Id.* at 264, 62 P.2d at 247. Thus, we concluded that insofar as the statute "denies the right of the unnaturalized foreign-born resident to keep and bear arms that may be used in defense of person or property, it contravenes the constitutional guaranty and therefore is void." *Id.* at 265, 62 P.2d at 247.[8] In reaching its holding, the *Nakamura* court was not required to determine what the status of the right to bear arms in self-defense was and, accordingly, that decision contains no analysis regarding whether that right is fundamental.

The next occasion in which this court applied article II, section 13, was *Lakewood v. Pillow,* 180 Colo. 20, 501 P.2d 744 (1972). In *Lakewood,* we reviewed the constitutionality of a municipal ordinance proscribing the possession or use of any deadly weapon except in one's home. In voiding the ordinance as overbroad, we observed "that it is so general in its scope that it includes within its prohibitions the right to carry on certain businesses and to engage in certain activities which cannot under the police power be reasonably classified as unlawful and thus, subject to criminal sanctions." *Id.* at 23, 501 P.2d at 745.[9] Thus, we held that "[d]epending upon

---

1, art. 2–a; *N.D. Const.* art. I, § 1; *Or. Const.* art. I, § 27; *Pa. Const.* art. I, § 21; *S.D. Const.* art. VI, § 24; *Tex. Const.* art. I, § 23; *Utah Const.* art. I, § 6; *Vt. Const.* ch. 1, art. 16; *Wash. Const.* art. I, § 24; *W.Va. Const.* art. III, § 22; and *Wyo. Const.* art. 1, § 24.

In guaranteeing the right to bear arms in self-defense, art. II, § 13 of the Colorado Constitution is broader than the constitutions of several states which have been construed merely to guarantee the collective or "state's right" to bear arms for the maintenance of the militia (though Colorado's Constitution also guarantees the right to bear arms for this purpose). *See, e.g., Alaska Const.* art. I, § 19; *Haw. Const.* art. I, § 15; *La. Const.* art. I, § 11; *N.C. Const.* art. I, § 30; *S.C. Const.* art. I, § 20. *See also Ark. Const.* art. II, § 5 (right to bear arms for "common defense"); *Mass. Const.* pt. 1 art. XVII (same); *Tenn. Const.* art. I, § 26 (same). California, Iowa, Maryland, Minnesota, New Jersey, and Wisconsin have no constitutional provisions specifically guaranteeing the right to bear arms.

7. The right of individuals to bear arms in defense of person, home, and property will be referred to as the right to bear arms in self-defense.

8. As support for this conclusion, we quoted the following passage from *Smith v. Farr,* 46 Colo. 364, 104 P. 401 (1909): "The police power of a state cannot transcend the fundamental law, and cannot be exercised in such a manner as to work a practical abrogation of its provisions." *Nakamura,* 99 Colo. at 264, 62 P.2d at 247.

9. As examples of such activities, the court "note[d] that this ordinance would prohibit gunsmiths, pawnbrokers and sporting goods stores from carrying on a substantial part of their business. Also, the ordinance appears to prohibit individuals from transporting guns to and from

the circumstances, all of these activities and others may be entirely free of any criminal culpability yet the ordinance in question effectively includes them within its prohibitions and is therefore invalid." *Id.* Again, in reaching this conclusion, we were neither required to determine the status of the right to bear arms nor was there any analysis of whether that right is fundamental.

Similarly, in *People v. Blue,* 190 Colo. 95, 544 P.2d 385 (1975), we upheld the constitutionality of a statute which prohibited the possession of any firearm by persons convicted of certain crimes. In so holding, we first recognized that the Colorado Constitution does not guarantee an absolute right to bear arms under all circumstances, *id.* at 103, 544 P.2d at 391, and concluded that "[i]n our view, the statute here is a legitimate exercise of the police power." *Id.* Once again, we were not required to determine the status of the right to bear arms in self-defense but rather, we resolved only the question of whether the law at issue constituted a legitimate exercise of the state's police power.

Likewise, in *People v. Ford,* 193 Colo. 459, 568 P.2d 26 (1977), we concluded that a "flat prohibition" on the right of certain felons to possess firearms was subject to the guarantee of article II, section 13. *Id.* at 462, 568 P.2d at 28. In concluding that the constitution required recognition of an affirmative defense to this statute if a defendant shows that his purpose in possessing weapons was the defense of his home, person, and property, the court never determined the status of the right to bear arms in self-defense.

Finally, in *People v. Garcia,* 197 Colo. 550, 595 P.2d 228 (1979), we upheld, against a vagueness and overbreadth challenge, the constitutionality of a statute which prohibited the possession of any firearm by a person under the influence of intoxicating liquor or of a narcotic or dangerous drug. Doing so, we recognized that "[t]he right to bear arms is not absolute, and it can be restricted by the state's valid exercise of its police power." *Id.* at 552, 595 P.2d at 230 (citing *Blue,* 190

Colo. 95, 544 P.2d 385). In light of this fact we held:

> It is clearly reasonable for the legislature to regulate the possession of firearms by those who are under the influence of alcohol or drugs. Unlike *City of Lakewood,* the statute here proscribes only that behavior which can rationally be considered illegitimate, and thus properly prohibited by the state's exercise of its police power. Accordingly, the statute does not restrict the exercise of any fundamental right and is not overbroad.

*Id.,* at 553, 595 P.2d at 230.

As in every other case of this court construing article II, section 13, the *Garcia* court did not find it necessary to determine the status of the right to bear arms in self-defense. Rather, the court considered whether the law at issue constituted a reasonable exercise of the state's police power and was therefore constitutional.

As these cases make clear, when confronted with a challenge to the validity of a statute or ordinance regulating the exercise of the right to bear arms guaranteed under article II, section 13 of the Colorado Constitution, a reviewing court need not determine the status of that right. Rather, the question in each case is whether the law at issue constitutes a reasonable exercise of the state's police power.

This approach is in accordance with the vast majority of cases construing state constitutional provisions which guarantee an individual's right to bear arms in self-defense.

> That the right to bear arms is not an unlimited right and is subject to reasonable regulation is an accepted principle among other jurisdictions. The majority of the cases which have decided this issue have taken the position that legislation which regulates or prohibits the possession or use of certain arms must be *reasonable* to be a valid exercise of the police power.

*Arnold v. Cleveland,* 67 Ohio St.3d 35, 616 N.E.2d 163, 172 (1993) (citations omitted). *See also Sklar v. Byrne,* 727 F.2d 633, 637

---

such places of business. Furthermore, it makes it unlawful for a person to possess a firearm in a vehicle or in a place of business for the purpose

of self-defense." *Lakewood,* 180 Colo. at 23, 501 P.2d at 745.

(7th Cir.1984) (right to bear arms under the Illinois Constitution is subject to substantial regulation under the state's police power); *Rabbitt v. Leonard,* 36 Conn.Supp. 108, 413 A.2d 489 (1979) (right to bear arms subject to reasonable exercise of police power); *Rinzler v. Carson,* 262 So.2d 661 (Fla.1972) (right to bear arms subject to valid police power regulation); *Carson v. State,* 241 Ga. 622, 247 S.E.2d 68, 72 (1978) ("the question in each case being whether the particular regulation involved is legitimate and reasonably within the police power, or whether ... under the name of regulation, [it] amounts to a deprivation of the constitutional right") (quotations omitted); *Kalodimos v. Morton Grove,* 103 Ill.2d 483, 83 Ill.Dec. 308, 315, 470 N.E.2d 266, 273 (1984) (right to bear arms under the Illinois Constitution is subject to substantial regulation under the state's police power); *Matthews v. State,* 237 Ind. 677, 148 N.E.2d 334 (1958) (right to bear arms subject to reasonable exercise of police power); *State v. Hamlin,* 497 So.2d 1369 (La.1986) (same); *People v. Brown,* 253 Mich. 537, 235 N.W. 245 (1931) (same); *State v. LaChapelle,* 234 Neb. 458, 451 N.W.2d 689 (1990) (same); *State v. Dees,* 100 N.M. 252, 669 P.2d 261

(Ct.App.1983) (same); *Grimm v. New York,* 56 Misc.2d 525, 289 N.Y.S.2d 358 (1968) (same); *North Carolina v. Fennell,* 95 N.C.App. 140, 382 S.E.2d 231 (1989) (same); *Commonwealth v. Ray,* 218 Pa.Super. 72, 272 A.2d 275 (1970) (same); *City of Princeton v. Buckner,* 180 W.Va. 457, 377 S.E.2d 139 (1988) (same); *State v. Rupe,* 101 Wash.2d 664, 683 P.2d 571 (1984) (same); *Carfield v. State,* 649 P.2d 865 (Wyo.1982) (same).[10]

Of all the cases cited above, only *Arnold v. Cleveland,* 67 Ohio St.3d 35, 616 N.E.2d 163 (1993) and *Rabbitt v. Leonard,* 36 Conn.Sup. 108, 413 A.2d 489 (1979), expressly reach a holding on the question of the status of the right to bear arms. Indeed these are the *only* cases we are aware of that determine whether the individual right to bear arms in self-defense is a fundamental right.[11] Both of those cases conclude the right is fundamental but nevertheless is subject to the reasonable exercise of the state's police power.

■ Based on the precedent of this court, we conclude that the trial court erred in reaching the question of the status to be accorded the right guaranteed under article

**10.** However, outright prohibitions on the possession of all firearms have been held to violate constitutional protections. *See e.g. City of Las Vegas v. Moberg,* 82 N.M. 626, 485 P.2d 737, 738 (Ct.App.1971) (statute which completely prohibits the right to bear arms is unconstitutional; it denies the right as opposed to regulating it); *In re Brickey,* 8 Idaho 597, 70 P. 609 (1902) (invalidating statute prohibiting the carrying of any weapon in the state's cities, towns, and villages, concluding that the legislature may regulate but not prohibit the right to bear arms).

It is significant to note that while plaintiffs argue that because the right to bear arms is fundamental, any restrictions on that right must be subject to strict scrutiny, they fail to point to even one published opinion where the strict scrutiny standard of review has been applied to a firearms regulation, and we are aware of none. Though this could be explained by noting that several cases striking down arms regulations were decided prior to development of the "strict scrutiny" test, *see, e.g., Wilson v. State,* 33 Ark. 557 (1878); *Nunn v. State,* 1 Ga. (1 Kelly) 243 (1846); *Bliss v. Commonwealth,* 12 Ky. (2 Litt.) 90, 12 Am.Dec. 251 (1822), the vast majority of cases addressing regulations on the right to bear arms in self-defense have been decided after the development of this test.

**11.** In *In re Application of Wolstenholme,* 1992 WL 207245 (Del.Super.1992), the court addressed the question whether there was a fundamental right to carry a concealed weapon. The court held there was not. The courts in *Sklar v. Byrne,* 727 F.2d 633 (7th Cir.1984) and *Kalodimos. v. Morton Grove,* 103 Ill.2d 483, 83 Ill.Dec. 308, 470 N.E.2d 266 (1984), were presented with the question of whether the right to bear arms guaranteed under the Illinois Constitution is a fundamental right. Neither court resolved that question but concluded, based on the text and history of the Illinois Constitution, that the right to bear arms in Illinois is subject to extensive regulation under the state's police power and held therefore, that regulations on the right to bear arms are not subject to the strict scrutiny standard of review. *Sklar,* 727 F.2d at 637 ("[s]ince the state constitutional right is narrowly circumscribed by the police power, the fact that the Chicago ordinance as a whole affects the right does not trigger compelling state interest analysis of the ordinance"); *Kalodimos,* 83 Ill. Dec. at 494–95, 470 N.E.2d at 277–78 (applying the rational basis test to an ordinance prohibiting the possession of handguns on the grounds that "the right to bear arms secured by the Illinois Constitution, which did not exist prior to 1970, is subject ... to substantial infringement in the exercise of the police power even though it operates on the individual level").

II, section 13 of the Colorado Constitution and in holding that the right is fundamental. Such an analysis and conclusion is contrary to the entire body of precedent of this court.

Furthermore, we hold that the trial court erred in reviewing the ordinance under the strict scrutiny standard of review and in asking whether the ordinance was supported by a compelling state interest and narrowly tailored to meet that interest. *See Evans v. Romer,* 854 P.2d 1270, 1275 (Colo.) (recognizing that laws which infringe on fundamental rights are subject to strict judicial scrutiny), *cert. denied,* —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). The court invalidated one section of the ordinance, 38–130(b)(1)(b),[12] on the grounds that it was not supported by a compelling state interest and limited the scope of another, section, 38–130(h), so that it would prohibit only those weapons for which defendants had shown a compelling state interest in banning. *See infra* note 16. For the reasons stated above, we hold that the trial court erred in subjecting these provisions to the strict scrutiny standard of review.[13]

Similarly, we conclude that the trial court erred in holding section 38–130(e) unconstitutional because it does not permit the possession of assault weapons for self-defense. That section provides that "[i]t shall be unlawful to carry, store, keep, manufacture, sell or otherwise possess within the City and County of Denver a weapon or weapons defined herein as assault weapons...." The trial court concluded that this section is unconstitutionally overbroad because "limiting the use of such weapons in such a manner that the weapons can not legally be used for the purpose of defense of person, property or home is in direct conflict with article II, section 13 of the Colorado Constitution."[14]

"A statute is facially overbroad if it sweeps within its reach constitutionally protected, as well as unprotected, activities." *People v. Ryan,* 806 P.2d 935, 939–40 (Colo.), *cert. denied,* —— U.S. ——, 112 S.Ct. 177, 116 L.Ed.2d 140 (1991). The right to bear arms may be regulated by the state under its police power in a reasonable manner. Thus, we conclude that the trial court erred in holding that restricting the types of weapons that may be used in exercising the right to bear arms in self-defense constitutes a *per se* violation of that right.

### III

We turn next to the question of whether the ordinance is constitutional under the analysis outlined above. An act is within the state's police power if it is reasonably related to a legitimate governmental interest such as the public health, safety, or welfare. *People v. Gross,* 830 P.2d 933 (Colo.1992); *People v. Pharr,* 696 P.2d 235 (Colo.1984);

---

12. Though the trial court's order refers to § "(b)(1)c," it is clear that the court is actually discussing § 38–130(b)(1)(b) which refers to semiautomatic shotguns with a folding stock. Section 38–130(b)(1)(b) is the only section of the ordinance which refers specifically to shotguns equipped with folding stocks.

13. We also note that the trial court erred in applying an overbreadth analysis to § 38–130(b)(1)(b). After concluding that this section was not supported by a compelling state interest—a finding which, under strict scrutiny, is sufficient to invalidate the section—the court went on to say that if concealability was a sufficient reason to ban these weapons, then handguns too could be prohibited. While this reasoning may be correct, the fact is that this section does not, by any stretch of the imagination, purport to ban the possession of all handguns. Assuming, as the trial court did, that such a ban would be unreasonable, this section of the statute cannot be overbroad on the grounds that it prohibits the possession of handguns.

In order to find facial overbreadth, the alleged overbroad application of the statute must be real. *People v. Batchelor,* 800 P.2d 599, 601 (Colo. 1990). The ordinance does not prohibit the possession of all handguns and thus, this "overbroad" application of the ordinance is not real.

14. Paradoxically, the trial court concluded that this section is unconstitutional because "it precludes constitutionally protected conduct" in spite of the fact that earlier in its order, the court held that "the ordinance is narrowly tailored to serve the previously determined compelling governmental interest. Thus, the ordinance does not violate article II, section 13, and is not constitutionally overbroad as it relates to the ban on assault weapons."

These two conclusions are irreconcilable because a law which infringes on a fundamental right is constitutionally permissible so long as it is supported by a compelling governmental interest and narrowly tailored to serve that interest.

*Bushnell v. Sapp,* 194 Colo. 273, 571 P.2d 1100 (1977).

The statement of legislative intent contained in the ordinance reads as follows:

> The city council hereby finds and declares that the use of assault weapons poses a threat to the health, safety and security of all citizens of the City and County of Denver. Further, the council finds that assault weapons are capable both of a rapid rate of fire as well as of a capacity to fire an inordinately large number of rounds without reloading and are designed primarily for military or antipersonnel use.
>
> The city council finds that law enforcement agencies report increased use of assault weapons for criminal activities. This has resulted in a record number of related homicides and injuries to citizens and law enforcement officers. It is, therefore, the intent of the city council to place reasonable and necessary restrictions on the sale and possession of assault weapons while placing no restrictions on the right of citizens to use weapons which are primarily designed and intended for hunting, target practice and other legitimate sports or recreational activities and the protection of home, person and property.

§ 38–130(a).

The city council expressly sought to promote the health, safety, and security of the citizens of Denver by enacting the ordinance. More specifically, it declared that prohibiting the possession and sale of assault weapons was premised on the city's interest in curbing crime—particularly homicides. As common sense suggests, "[a] state has a very significant interest in preventing crime." *Gross,* 830 P.2d at 941. *See also People v. French,* 762 P.2d 1369, 1373–74 (Colo.1988) (prevention of crime is a compelling state interest). There can be no doubt that an ordinance, intended to prevent crime, serves a legitimate governmental interest sufficiently strong to justify its enactment.

In addition, the evidence presented to the trial court clearly showed that the ordinance is reasonably related to this interest. For example, A.W. Zavares, the chief of police of Denver, testified that "assault weapons are becoming the weapons of choice for drug traffickers and other criminals." Evidence also was presented indicating that assault weapons were used in one of every ten crimes that resulted in a Bureau of Alcohol, Tobacco, and Firearm trace in 1988–89. Further, the evidence indicated that assault weapons accounted for nearly thirty percent of all firearms traced to organized crime, gun trafficking, and terrorists, and over twelve percent of drug related crimes nationwide.[15]

The unique characteristics of assault weapons coupled with the prevalent use of such weapons for criminal purposes establish that such weapons pose a substantial threat to the health and safety of the citizens of Denver.[16]

---

**15.** The prevalent use of assault weapons for criminal purposes has been recognized by the Bureau of Alcohol, Tobacco, and Firearms (ATF), an agency of the United States Department of the Treasury which is responsible for the enforcement of federal firearms laws. *See Report and Recommendations of the ATF Working Group on the Importability of Certain Semi–Automatic Rifles,* (July 6, 1989). ATF Director Stephen E. Higgins, in a sworn declaration filed in federal court, stated:

> The primary reason that immediate action was necessary to stop the importation of semi-automatic assault-type rifles was the dramatic increase in the use of these types of weapons in crime and the threat to public safety presented by such increase.... Almost daily ATF special agents and other Federal, State, and local police see the spread of assault-type weapons on the street. It is the general consensus of law enforcement officials that the ever-increasing presence of assault-type rifles in the illicit drug

trade and in other types of crime places the safety and the very lives of the American public in immediate peril. The proliferation of these weapons and their massive firepower also poses a tremendous threat to the lives of Federal, State and local police officers who are outgunned by the criminals they encounter on the streets.

Declaration of Stephen E. Higgins, Director, ATF, filed in *Gun South, Inc. v. Brady,* 711 F.Supp. 1054 (N.D.Ala.1989).

**16.** Two of the salient features of assault weapons which make them particularly threatening are their capability for a rapid rate of fire and the ability to fire many rounds without reloading. One enthusiast has characterized "the assault pistol's forte [as being] the capability of delivering an impressively large number of shots in a rapid, roaring staccato, without need to pause even briefly to slam in a fresh magazine." J. Lewis, *The Gun Digest Book of Assault Weapons* 48 (2d ed. 1989).

In addition, the evidence at trial supports the conclusion that weapons which are easily concealed, such as shotguns equipped with folding stocks, pose a greater threat to law enforcement officials and the public at large because their concealability makes them better suited to criminal purposes.

Finally, the evidence presented to the trial court established that Denver has sought to prohibit the possession and use of approximately forty firearms. The evidence also established that currently there are approximately 2,000 firearms available for purchase and use in the United States. Given the narrow class of weapons regulated by the ordinance, we have no hesitancy in holding that the ordinance does not impose such an onerous restriction on the right to bear arms as to constitute an unreasonable or illegitimate exercise of the state's police power: there are literally hundreds of alternative ways in which citizens may exercise the right to bear arms in self-defense. While carving out a small category of arms which cannot be used for purposes of self-defense undoubtedly limits the ways in which the right to bear arms may be exercised, the barriers thereby created do not significantly interfere with this right. To the contrary, as the evidence plainly shows, there are ample weapons available for citizens to fully exercise their right to bear arms in self-defense.

Plaintiffs argue that the ordinance is not reasonably related to the state's interest because assault weapons account for only one-half of one percent of the estimated 200 million privately owned weapons in the United States and are used in roughly one percent of all "gun crime." While these statistics support the inference that a ban on assault weapons is unlikely to have a dramatic effect on crime, this fact is irrelevant for constitutional purposes.[17] "[A] statute is not invalid under the Constitution because it might have gone farther than it did [and] reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966) (quotations and citations omitted). *See also People v. Elliott,* 186 Colo. 65, 525 P.2d 457 (1974).

In our judgment, the evidence presented to the trial court undeniably demonstrates that the ordinance is reasonably related to a legitimate governmental interest and constitutes a valid exercise of the state's police power on the right to bear arms in self-defense.

## IV

■ Defendants argue that the trial court erred in concluding that certain provisions of the ordinance are unconstitutionally vague. The basic inquiry in a void-for-vagueness challenge is whether the law forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application. *People v. Gross,* 830 P.2d 933, 937 (Colo.1992); *People v. Becker,* 759 P.2d 26, 31 (Colo.1988). In evaluating a vagueness challenge, we are mindful that "statutory language must strike a balance between two potentially conflicting concerns: it must be specific enough to give fair warning of the prohibited conduct, yet must be sufficiently general to address the problem under varied circumstances and during

---

The trial court concluded that Denver had shown a compelling state interest in banning those assault weapons which had both of these features. It concluded that both features had to exist in order to justify the ban because referring to semiautomatic weapons with a "greater rate of fire" was, standing alone, meaningless inasmuch as "all semiautomatics fire one and only one shot per trigger pull and that all semiautomatics can fire no more rapidly than the shooter can repeatedly squeeze the trigger."

While it is true that semiautomatic firearms fire one round for each pull of the trigger, we disagree with the trial court's conclusion that this characteristic is without meaning. It is the fact that assault weapons are *capable* of a rapid rate of fire, in that they will fire as fast as the shooter can pull the trigger, that makes them a greater threat to the public safety and welfare as compared to other firearms, not that they will, by virtue of being assault weapons, *always* fire at a greater rate when compared to other types of weapons.

**17.** These statistics support the conclusion that prohibiting the possession of assault weapons does not constitute an unreasonable exercise of the state's police power.

changing times." *Parrish v. Lamm,* 758 P.2d 1356, 1367 (Colo.1988). Moreover, the strictness of the vagueness test depends on whether the challenged law threatens to inhibit the exercise of constitutionally protected rights. *Id.* at 1366–67; *People v. Garcia,* 189 Colo. 347, 349, 541 P.2d 687, 688–89 (1975). When such constitutionally protected behavior may be inhibited, a greater degree of specificity is required than when a law does not implicate constitutionally protected liberties. *Parrish,* 758 P.2d at 1367.

■ The trial court found two phrases used in section 38–130(b)(1) to be impermissibly vague. First, it stated that the reference to weapons which may have "a shorter length than recreational firearms" was vague because "citizens must guess what length a 'recreational firearm' possesses." Second, the court found that "the phrase 'a greater rate of fire' has no meaningful definition, since all semiautomatics have the same rate of fire."

We do not agree that section 38–130(b)(1) is vague. That section expressly states that an assault weapon "may include" certain "general characteristics," including those characteristics the court invalidated as vague. No weapon is actually classified as an assault weapon, and thus banned, under the ordinance based on the language of section 38–130(b)(1). Rather, the definition of an assault weapon "shall include" the characteristics set forth in section 38–130(b)(1)(a)— (f) and only those "weapons defined herein as assault weapons" are banned in section 38–130(e). Consequently, we conclude that because section 38–130(b)(1) does not demarcate what weapons are covered by the ordinance, the language of that section neither prohibits nor requires the doing of anything.[18] As such, this section is not unconstitutionally vague and there is little if any risk that this language might inhibit the exercise of the right to bear arms.

■ The trial court also concluded that section 38–130(b)(1)(c) is unconstitutionally vague. That section defines an assault weapon to include "[a]ll semiautomatic pistols that are modifications of rifles having the same make, caliber and action design but a shorter barrel and no rear stock or modifications of automatic weapons originally designed to accept magazines with a capacity of twenty-one (21) or more rounds." The court concluded that this section was vague for the following reasons:

> Persons attempting to comply with this section must also learn not only what guns their pistol was designed from, but also learn the design history of the ancestor guns to determine if it was [an] automatic weapon "originally designed to accept magazines with a capacity of twenty-one (21) or more rounds" or if it has "the same" action design. These characteristics can not be readily [ascertained] by a person of common intelligence.

Defendants argue this conclusion is erroneous because it is "not unreasonable" to require persons purchasing or possessing pistols to determine if it is an assault pistol as defined by section 38–130(b)(1)(c). In support of this contention, defendants argue that a number of publications are available which provide all the information needed to determine whether a pistol is an assault pistol. In our judgment, this fact does not render this section of the ordinance constitutional.

■ First, vagueness is not determined by reference to whether it is *reasonable* to require individuals to assess whether a given law applies to them. *See supra* p. 334. Second, we are not persuaded that simply because publications exist which contain the information needed to establish the design history of a pistol, that this saves section 38–130(b)(1)(c) from being vague. Whether per-

---

18. The trial court recognized this fact by noting that pursuant to § 38–130(b)(1), "an 'assault weapon' *may* contain certain features. Whether those features are present on a particular weapon is not determinative that the weapon is an 'assault weapon.' The determining characteristics are set forth in Sections 38–130(a)(1)a through f of the ordinance."

We note parenthetically that while the above quotation taken from the trial court's order referred to § 38–130(a)(1), it is clear that the court was referring to § (b)(1), as there is no § (a)(1) of the ordinance.

sons of ordinary intelligence must necessarily guess as to an ordinance's meaning and application does not turn on whether some source exists for determining the proper application of a law. Unlike the ordinance at issue in *Colorado Dog Fanciers v. Denver*, 820 P.2d 644 (Colo.1991), the assault weapon ordinance does not specify any source which would aid in defining what an assault pistol is, nor does it state where such a source can be found.

Section 38–130(b)(1)(c) does not provide sufficient information to enable a person of common intelligence to determine whether a pistol they possess or may purchase has a design history of the sort which would bring it within this section's coverage. As the trial court correctly concluded, ascertaining the design history and action design of a pistol is not something that can be expected of a person of common intelligence. Consequently, we conclude that the trial court correctly determined that section 38–130(b)(1)(c) is unconstitutionally vague.

■ We conclude that this section, though vague, is severable from the remainder of the ordinance. "As a general rule, if a statute is constitutional in one part and unconstitutional in another, the constitutional provision may be sustained and the unconstitutional stricken." *City of Lakewood v. Colfax Unlimited Ass'n, Inc.*, 634 P.2d 52, 70 (Colo. 1981). "Whether unconstitutional provisions are excised from an otherwise sound law depends on two factors: (1) the autonomy of the portions remaining after the defective provisions have been deleted and (2) the intent of the enacting legislative body." *Id.*

It is clear that the remaining sections of the ordinance are autonomous from section 38–130(b)(1)(c). This section attempted to proscribe the possession of one type of assault weapon. The other provisions of the ordinance, which proscribe the possession of other weapons and dictate the scope and exceptions to the prohibition, are given their full force and effect irrespective of section 38–130(b)(1)(c). The only result of finding this section vague is that the reach of the ordinance is slightly narrower than as enacted.

As for the legislative intent in enacting the ordinance, there is no evidence that Denver would not have passed this law had it known that section 38–130(b)(1)(c) was unconstitutional. To the contrary, Denver's intention to allow for severability is clearly set forth in its municipal code which provides, in part, that "the council hereby declares that in these regards the provisions of this Code and all rules and regulations promulgated hereunder are severable." Denver, Colo., Rev. Mun.Code, § 1–12 (1989).

Consequently, we conclude that the offending section of the ordinance is severable from those portions of the ordinance that are constitutional.

### V

In conclusion, we hold that the trial court erred in holding that the right to bear arms in self-defense, guaranteed by article II, section 13, is a fundamental right. Such a determination is not necessary in analyzing a constitutional challenge premised on article II, section 13. We also hold that the trial court erred in concluding that the ordinance must be subject to strict scrutiny in order to evaluate its constitutionality. Thus, it erred in: (1) requiring defendants to show that the ordinance is supported by a compelling state interest and narrowly tailored to meet that interest; (2) limiting the prohibition on those weapons listed in section 38–130(h) only to include those weapons which meet the definitions of section 38–130(b)(1);[19] and, (3) concluding that section 38–130(b)(1)(b) and section 38–130(e), are unconstitutionally overbroad because they infringe on the right to bear arms. We affirm its conclusion that section 38–130(b)(1)(c) is void for vagueness.

---

**19.** This conclusion of the trial court obviated the need to address plaintiffs' claim that § 38–130(h) is unconstitutionally vague because over half the weapons listed in that section either are not semiautomatics or do not exist.

Because we conclude that the ruling which rendered that claim moot was erroneously decided, the case must be remanded to the trial court in order to address plaintiffs' vagueness challenge to § 38–130(h) in a manner not inconsistent with this opinion.

Judgment affirmed in part, reversed in part, and case remanded with directions.

VOLLACK, J., concurs in the result.

ERICKSON, J., dissents.

### APPENDIX

Section 38–130 Assault weapons

(a) *Legislative intent.* The city council hereby finds and declares that the use of assault weapons poses a threat to the health, safety and security of all citizens of the City and County of Denver. Further, the council finds that assault weapons are capable both of a rapid rate of fire as well as of a capacity to fire an inordinately large number of rounds without reloading and are designed primarily for military or antipersonnel use.

The city council finds that law enforcement agencies report increased use of assault weapons for criminal activities. This has resulted in a record number of related homicides and injuries to citizens and law enforcement officers. It is, therefore, the intent of the city council to place reasonable and necessary restrictions on the sale and possession of assault weapons while placing no restrictions on the right of citizens to use weapons which are primarily designed and intended for hunting, target practice and other legitimate sports or recreational activities and the protection of home, person and property.

(b) *Definitions.* The following words and phrases, when used in this section, shall have these meanings respectively ascribed to them:

(1) *Assault weapon.* The general characteristics of an assault weapon may include the following features: A shorter length than recreational firearms; a folding stock; a modification of an automatic firearm originally designed for military use; a greater rate of fire or firing capacity than reasonably necessary for legitimate sports, recreational or protection activities and shall include all firearms with any of the following characteristics:

a. All semiautomatic action, center-fire rifles with a detachable magazine with a capacity of twenty-one (21) or more rounds.

b. All semiautomatic shotguns with a folding stock or a magazine capacity of more than six (6) rounds or both.

c. All semiautomatic pistols that are modifications of rifles having the same make, caliber and action design but a shorter barrel and no rear stock or modifications of automatic weapons originally designed to accept magazines with a capacity of twenty-one (21) or more rounds.

d. Any firearm which has been modified to be operable as an assault weapon as defined herein.

e. Any part or combination of parts designed or intended to convert a firearm into an assault weapon, including a detachable magazine with a capacity of twenty-one (21) or more rounds, or any combination of parts from which an assault weapon may be readily assembled if those parts are in the possession or under the control of the same person.

f. Any weapon listed in subsection (h).

(2) *Fixed cartridge* shall mean that self-contained unit consisting of the case, primer, propellant charge and projectile or projectiles.

(3) *Magazine* shall mean a box, drum or other container which holds and feeds ammunition into a semiautomatic rifle, shotgun or pistol.

(4) *Pistol* shall mean a weapon originally designed, made and intended to fire a projectile (bullet) from one (1) or more barrels when held in one (1) hand and having:

a. A chamber as an integral part of or permanently aligned with the bore or having a breech-loading chambered cylinder so arranged that the cocking of the hammer or movement of the trigger rotates it and brings the next cartridge in line with the barrel for firing; and

b. A short stock designed to be gripped by one (1) hand and at an angle

to and extending below the line of the bore(s).

(5) *Rifle* shall mean a weapon designed or redesigned, made or remade and intended to be fired from the shoulder or hip and designed or redesigned or made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger and shall include any such weapon which may be readily restored to fire a fixed cartridge.

(6) *Semiautomatic* shall mean a weapon which fires a single projectile for each single pull of the trigger which automatically chambers the next round for firing and which employs a magazine.

(7) *Shotgun* shall mean a weapon designed or redesigned, made or remade and intended to be fired from the shoulder or hip and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.

(c) *Specific weapons not included.* As used in this section, *assault weapon* does not include any of the following:

(1) All weapons that do not use fixed cartridges, all weapons that were in production prior to 1898, all manually operated bolt-action weapons, all lever-action weapons, all slide-action weapons, all single-shot weapons, all multiple-barrel weapons, all revolving-cylinder weapons, all semiautomatic weapons for which there is no fixed magazine with a capacity of twenty-one (21) or more rounds available, all semiautomatic weapons that use exclusively en bloc clips, all semiautomatic weapons in production prior to 1954 and all rimfire weapons that employ a tubular magazine.

(2) Any firearm that uses .22 caliber rimfire ammunition.

(3) Any assault weapon which has been modified either to render it permanently inoperable or to permanently make it a device no longer defined as an assault weapon.

(d) *Supplemental provisions.* Except as specifically stated herein, the provisions of this section are independent of and supplemental to any other provisions of law, and nothing shall prevent a device defined as an *assault weapon* in this section from also being regulated under other provision of law.

(e) *Possession of assault weapons unlawful.* It shall be unlawful to carry, store, keep, manufacture, sell or otherwise possess within the City and County of Denver a weapon or weapons defined herein as assault weapons, except that this subdivision shall not apply to:

(1) Any federal, state or local government agency or to any sworn members of said agencies acting within their official capacities.

(2) Any assault weapon which is being used as a movie prop for any motion picture or television program which is being filmed in whole or in part within the City and County of Denver if, prior to such use, the police department is notified in advance in writing of the date, time, location, production schedule and days upon which such use shall take place and the type and serial numbers of the firearms.

(3) The transportation of any assault weapon through the city by a nonresident who is in legal possession of an assault weapon or a person carrying a permit issued under subsection (f) for the purposes and under the conditions set forth in subsections (b)(2) through (b)(5), Revised Municipal Code.

(f) *Conditional exception.* Any person over the age of twenty-one (21) years who obtained an assault weapon legally prior to the effective date of this section may obtain a permit to keep, store and possess said assault weapon if:

(1) Said weapon is properly identifiable and contains its original serial number.

(2) An application for a permit for each assault weapon is filed with the police department within sixty (60) days of the effective date of this section pursuant to such procedures as the department may establish. The application shall contain a description of the firearm that identifies it uniquely, including all identification marks and numbers, the full name, address, date of birth and fingerprints of the owner and the address where such assault weapon will be stored and such other information as the department may deem appropriate. The place of storage and possession shall not be changed without notification to the department of the proposed change in location and when said weapon will be transported. The department may charge a fee for registration not to exceed the actual processing costs of the department.

(3) The department shall issue a permit which shall identify the weapon and where it is to be stored.

(4) The information required for the registration and permitting of assault weapons shall be treated as confidential and shall not be made available to members of the general public. The council finds that release of such information would constitute an unwarranted invasion of personal privacy and could endanger the life or safety of person at the premises where an assault weapon is located. The information on a permit application shall be used by the city only for law enforcement purposes.

(g) *Sale or transfer unlawful.* It is unlawful to sell or transfer possession of an assault weapon possessed pursuant to subsection (f) within the City and County of Denver.

(h) *Specific prohibited assault weapons.* It is unlawful to carry, store or otherwise possess within the City and County of Denver any of the following weapons which are hereby declared to be assault weapons except as provided in and subject to all the provisions of this section:

(1) All of the following specified rifles:

a. Norinco, Mitchell and Poly Technologies Avtomat Kalashnikovs (all models).

b. Action Arms Israeli Military Industries UZI and Galil.

c. Beretta AR–70 (SC–70).

d. CETME G3.

e. Colt AR–15 and CAR–15.

f. Daewoo K–1, K–2, Max 1 and Max 2.

g. Fabrique Nationale (FN/FAL, FN/LAR and FNC.

h. FAMAS MAS223.

i. Heckler & Koch HK–91, H–93, HK–94 and PSG–1.

j. MAC 10 and MAC 11.

k. SKS with detachable magazine.

l. SIG AMT, SIG 500 Series and SIG PE–57.

m. Springfield Armory BM59 and SAR–48.

n. Sterling MK–6 and SAR.

o. Steyr AUG.

p. Valmet M62, M71S and M78.

q. Armalite AR–180 Carbine.

r. Bushmaster Assault Rifle (armgun).

s. Calico M–900 Assault Carbine.

t. Mandall THE TAC–1 Carbine.

u. Plainfield Machine Company Carbine.

v. PJK M–68 Carbine.

w. Weaver Arm Nighthawk.

(2) All of the following specified pistols:

a. Action Arms UZI.

b. Encom MP–9 and MP–45.

c. MAC 10 and MAC 11.

d. INTRATEC TEC–9.

e. Mitchell Arms Spectre Auto.

f. Sterling MK–7.

g. Calico M–900.

(3) All of the following specified shotguns:

a. Franchi SPAS 12 and LAW 12.

b. Gilbert Equipment Company Striker 12.

c. Encom CM–55.

(4) Other models by the same manufacturer that are identical to firearms listed in subdivisions (1), (2) or (3) except for slight modifications or enhancements, including, but not limited to, a folding or retractable stock; adjustable sight; case deflector for left-handed shooters; shorter barrel; wooden, plastic or metal stock; larger clip size; different caliber provided the caliber exceeds .22 rimfire; or bayonet mount.

(5) Firearms which have been redesigned from, renamed, renumbered or patterned after one of the listed firearms in subdivisions (1), (2), (3) or those described in subdivision (4) regardless of the company of production or distribution or the country of origin or any firearm which has been manufactured or sold by another company under a licensing agreement to manufacture or sell the identical or nearly identical firearms as those listed in subdivision (1), (2), (3) or those described in subdivision (4) regardless of the company of production or distribution or the country of origin.

(i) *Specific magazine prohibited.* It shall be unlawful to carry, store or otherwise possess a magazine which will hold or may be modified to hold twenty-one (21) or more rounds.

(j) *Penalty.* Any person, firm or corporation who is convicted of violating any provision of this section shall be punished by a fine of not less than one hundred ($100.00) or more than nine hundred ninety-nine dollars ($999.00) and a term of incarceration of not less than ten (10) days nor more than one hundred eighty (180) days.

(k) *Violation; disposition.* Upon a conviction of violating any provision of this section, the weapon shall be confiscated and destroyed under section 38–120, Disposition of confiscated weapons.

(Ord. No. 669–89, § 1, 11–6–89; Ord. No. 719–89, § 1, 11–27–89)

Justice VOLLACK concurring in the result:

I concur in the result reached by the majority that Denver Ordinance No. 669 is constitutional. I disagree, however, with the majority's determination that this case does not require us to decide whether the right to bear arms is a fundamental right. I therefore write separately to emphasize my belief that we are required by the specific issue raised here, that is, whether the right to bear arms is a fundamental right, by the procedural posture of this case, by the relevant case law, and by the fundamental principles of judicial review, to evaluate the ordinance's constitutionality in conformity with established constitutional standards of review.

The legal premise underlying the majority opinion is that our prior decisions where we have considered article II, section 13, reveal that,

> when confronted with a challenge to the validity of a statute or ordinance regulating the exercise of the right to bear arms guaranteed under article II, section 13 of the Colorado Constitution, a reviewing court need not determine the status of that right. Rather, the question in each case is whether the law at issue constitutes a reasonable exercise of the state's police power.

Maj. op. at 329. The majority therefore concludes that the trial court erred in reaching the question of the status to be accorded the right to bear arms. I disagree.

In light of modern established principles defining fundamental constitutional rights, the right to bear arms under article II, section 13, of the Colorado Constitution is not a right which, in my opinion, has been recognized as having a value essential to individual liberties in our society. I would therefore hold that the right to bear arms is not a fundamental right.

I.

At issue in this case is the scope of article II, section 13, of the Colorado Constitution, which provides that "[t]he right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons."

The scope of the right of individuals to bear arms under the Colorado Constitution must be analyzed in conformity with modern established principles of constitutional review. When the constitutionality of an ordinance is challenged, the court must determine the appropriate standard of review in order to evaluate the constitutionality of the ordinance. *Zavala v. City and County of Denver*, 759 P.2d 664 (Colo.1988). The first step in this analysis is to determine the nature of the right, that is, whether a fundamental right is involved. In *United States v. Carolene Products*, 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 784 n. 4, 82 L.Ed. 1234 (1938), the Supreme Court distinguished two kinds of rights—fundamental and nonfundamental. Courts vary the level of scrutiny applied depending on the right involved. In Colorado, we have recognized three standards of review: the strict scrutiny test,[1] the intermediate scrutiny test,[2] or the rational basis test.[3]

The United States Supreme Court has given added protection to rights considered fundamental. A fundamental right is a right that has been recognized as having a value essential to individual liberties in our society. *Lujan v. Colorado State Bd. of Educ.*, 649 P.2d 1005, 1015 n. 7 (Colo.1982); *see also* John E. Nowak et al., *Constitutional Law* ch.

13, § 4, at 465 (3d ed. 1986). *Black's Law Dictionary* 674 (6th ed. 1990) defines "fundamental right" as "[t]hose rights which have their source, and are explicitly or implicitly guaranteed, in the federal Constitution ... and state constitutions."

Strict scrutiny is applied whenever a legislative enactment contains a suspect classification or limits a fundamental right. *Id.* at 1015. Thus, a court will uphold a law that restricts fundamental rights under the strict scrutiny test only if the law is necessary to promote a compelling or overriding governmental interest and the law is narrowly tailored to meet that interest.

The United States Supreme Court has found only a limited group of fundamental rights and has been reluctant to expand the list of fundamental constitutional rights. *See Evans v. Romer*, 854 P.2d 1270, 1291 (Colo.) (Erickson, J., dissenting), *cert. denied,* —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993). For example, the United States Supreme Court has held that the right to marry,[4] to vote,[5] and the right to interstate travel[6] are fundamental rights. In contrast, the Supreme Court has refused to recognize a fundamental right to education, housing, welfare payments, or government employment. *Id.* Where a fundamental right is not in-

---

1. Under the strict scrutiny standard of review, the most exacting standard of review, an ordinance which imposes a burden on or significantly interferes with a fundamental right must be narrowly drawn to a compelling state interest in order to withstand constitutional scrutiny. *Evans v. Romer*, 854 P.2d 1270, 1275 (Colo.), *cert. denied,* —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993); *Heninger v. Charnes*, 200 Colo. 194, 613 P.2d 884 (1980).

2. The United States Supreme Court has adopted an intermediate standard of review for specific classifications such as alienage, *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978); illegitimacy, *Lalli v. Lalli*, 439 U.S. 259, 265, 99 S.Ct. 518, 523, 58 L.Ed.2d 503 (1978); and gender, *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). Under this standard, the burden is on the state to show that the classification is substantially related to an important governmental objective. *R.McG. v. J.W.*, 200 Colo. 345, 615 P.2d 666 (1980); *People v. Green*, 183 Colo. 25, 514 P.2d 769 (1973).

3. If no fundamental right or suspect classification is involved, then the regulation needs to be rationally related to a constitutionally permissible purpose to withstand constitutional scrutiny. *Fritz v. Regents of Univ. of Colorado*, 196 Colo. 335, 586 P.2d 23 (1978).

4. *Zablocki v. Redhail*, 434 U.S. 374, 383, 98 S.Ct. 673, 679, 54 L.Ed.2d 618 (1978) (establishing a constitutional right to marriage and striking down a statute requiring a parent without child custody but with child support obligations to seek court approval before remarrying); *Loving v. Virginia*, 388 U.S. 1, 9, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010 (1967) (finding that marriage is a fundamental right and invalidating a law against racial intermarriage).

5. *Dunn v. Blumstein*, 405 U.S. 330, 336, 92 S.Ct. 995, 1000, 31 L.Ed.2d 274 (1972) (holding that the right to vote is fundamental).

6. *United States v. Guest*, 383 U.S. 745, 757, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966) (holding that the right to interstate travel occupies a position "fundamental to the concept of our Federal Union").

volved, a legislative enactment is tested under the rational basis test which requires the government to show that the ordinance is rationally related to a legitimate state interest. *Lujan,* 649 P.2d at 1016.

The majority acknowledges that the right to bear arms is an important constitutional right but nevertheless believes that this case does not require us to determine whether that right is fundamental. Maj. op. at 328. Despite well-established principles of law on the interpretation of constitutional guarantees, the majority does not address the nature of the right involved and the level of scrutiny applied. Rather, the majority avoids a constitutional review of the trial court's ruling, that the right to bear arms is a fundamental right subject to strict scrutiny, and instead disposes of this issue by determining that the ordinance constituted a legitimate exercise of the state's police power.

The majority has applied, in my opinion, an unprecedented legal standard, an exercise of police power, which, to my knowledge, has never been deemed an independent standard and which contravenes basic constitutional principles of the three standards of review. Further, acknowledging these established concepts of constitutional review, I am not convinced that we need not determine whether the right to bear arms is or is not a fundamental right.

### A.

I am guided by the constitutional review this court and other appellate courts have applied in evaluating a trial court's decision whether a fundamental right is implicated in a particular situation.

For example, in *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986),[7] a majority of the Supreme Court engaged in a fundamental rights analysis by directly addressing whether the Constitution confers a fundamental right upon homosexuals to indulge in sodomy. *Id.* at 190, 106 S.Ct. at 2843. In upholding Georgia's statute criminalizing sodomy, the majority concluded that there is no such fundamental right under the Constitution. *Id.* at 191, 106 S.Ct. at 2844.

In *Evans v. Romer,* 854 P.2d 1270 (Colo.), *cert. denied,* —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993), we addressed whether the trial court correctly determined, in granting a preliminary injunction, that Amendment 2 "may burden fundamental rights of an identifiable group." Because the trial court identified a fundamental right, it applied a strict scrutiny standard of review and found that the plaintiffs had demonstrated that Amendment 2 is unconstitutional. In reviewing whether Amendment 2 infringed on a fundamental right, we engaged in a constitutional standard of review analysis and ultimately concluded that the right to participate equally in the political process is a fundamental right which is subject to strict judicial scrutiny.

Further, in *Mayo v. National Farmers Union,* 833 P.2d 54 (Colo.1992), we reviewed a statute authorizing household exclusion clauses in automobile policies. The district court rejected the insureds' contention that the classification created by the statute unconstitutionally impaired their fundamental right to travel. We directly addressed the question whether a fundamental right is implicated by the statutory provision. We found that neither the statute nor the household exclusion clause infringed on the fundamental right to travel of insureds whose policy contained such an exclusion. We therefore concluded that the statute passed muster under the rational basis test. We performed this judicial standard of review based on the district court's determination that the statute survived an equal protection challenge.[8]

---

7. In *Hardwick v. Bowers,* 760 F.2d 1202, 1212 (11th Cir.1985), *rev'd,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), the Eleventh Circuit Court of Appeals ruled that the right to enter into private and intimate associations, even with the same gender, is a fundamental right. Therefore, the Eleventh Circuit ruled that the Georgia

law was unconstitutional unless it could pass the strict scrutiny test. *Id.* at 1213.

8. Other federal and state courts, when considering lower court determinations that a fundamental right is implicated, have applied a standard of review harmonious with established principles of constitutional review. For example, in *Trinsey v.*

The approach adopted by the majority is appealing in its simplicity but does not follow the analytical constitutional framework we have previously applied. In the present case, the trial court's ruling to hold the ordinance unconstitutional was based upon a finding that a fundamental right to bear arms existed. The trial court found that the Denver ordinance banning the manufacture, sale, or possession of assault weapons did not withstand strict scrutiny review. On appeal, the plaintiffs argue that this ordinance deprives them of the fundamental right to bear arms and the defendants argue that the trial court erred in concluding that the right to bear arms in the defense of home, person, and property is a fundamental right. Indeed, one of the questions presented for our review, as conceded in the main opinion in footnote 5, is whether the right to bear arms is a fundamental right. Guided by the fore-

going principles and given the procedural posture of this case, I believe that this case requires a determination of whether the right to bear arms is a fundamental right.

## B.

The question of whether there is a fundamental right to bear arms is not novel and has already been decided by several states. Recent state jurisprudence indicates that statutory classifications affecting firearms have not been held to infringe a fundamental right. Rather, courts have opined that the legislature may impose reasonable regulations over the constitutional right to bear arms in order to promote safety and welfare.[9] An examination of the way other states have construed their constitutional right to bear arms statutes[10] further sup-

Commonwealth of Pennsylvania, 941 F.2d 224 (3d Cir.), cert. denied, —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 750 (1991), the Commonwealth of Pennsylvania was faced with a constitutional challenge to its vacancy election law which permits each of the major political parties to select a candidate to run for the vacancy. A voter and prospective candidate challenged this provision as unconstitutional, claiming it violated his Fourteenth and Seventeenth Amendment rights. The United States District Court for the Eastern District of Pennsylvania agreed with Trinsey and issued a declaratory judgment finding the statute unconstitutional "because it operate[d] to abridge the right to vote of the citizens of the Commonwealth of Pennsylvania." The district court reviewed the statute under a strict scrutiny analysis because it found that a fundamental right had been implicated by the operation of the election law. Trinsey v. Commonwealth of Pennsylvania, 766 F.Supp. 1338, 1345–46 (E.D.Pa. 1991). On review, the United States Court of Appeals for the Third Circuit reversed the district court and held that "the Seventeenth Amendment does not mandate that Pennsylvania conduct a primary before holding a general election" and that therefore "no fundamental right [was] infringed by the Pennsylvania statute at issue." Trinsey, 941 F.2d at 234. Accordingly, the Third Circuit applied a deferential standard and upheld the provision. Id. at 233–34.

Similarly, in Graham v. Kirkwood Meadows Public Utilities District, 21 Cal.App. 4th 1631, 26 Cal.Rptr.2d 793 (3d Dist.1994), the court of appeals concluded that the trial court erred in concluding that the plaintiff had a fundamental right to continue his public employment since the trial court confused a fundamental right for purposes of the judicial standard of review of administrative decisions with a fundamental right for purposes of constitutional analysis. The

court of appeals therefore determined that the right to pursue a lawful occupation does not constitute a fundamental constitutional right invoking strict scrutiny. Id. at 1642–43, 26 Cal. Rptr.2d 793.

9. See, e.g., State v. Comeau, 233 Neb. 907, 448 N.W.2d 595, 598 (1989); Carfield v. State, 649 P.2d 865, 872 (Wyo.1982); State v. Rupp, 282 N.W.2d 125, 130 (Iowa 1979); Bristow v. State, 418 So.2d 927, 930 (Ala.Crim.App.1982); State v. Dees, 100 N.M. 252, 669 P.2d 261, 264 (App. 1983).

10. Forty-four states have constitutional guarantees on the right to keep and bear arms. Six states do not have a constitutional provision on arms: California, Iowa, Maryland, Minnesota, New Jersey, and Wisconsin. See, e.g., Hoskins v. State, 449 So.2d 1269 (Ala.Crim.App.1984) (finding that a statute prohibiting a person convicted of committing a crime of violence from owning or possessing a pistol does not deny a right to keep and bear arms); Rabbitt v. Leonard, 36 Conn.Supp. 108, 413 A.2d 489 (Super.Ct.1979) (holding that a statute permitting revocation of pistol permit for cause and providing notice of revocation and opportunity for de novo post-revocation hearing does not violate citizen's right to bear arms); State v. Friel, 508 A.2d 123 (Me. 1986), cert. denied, 479 U.S. 843, 107 S.Ct. 156, 93 L.Ed.2d 96 (1986) (holding that a statute prohibiting possession of a firearm by a convicted felon does not violate federal and state constitutional right to keep and bear arms); People v. Smelter, 175 Mich.App. 153, 437 N.W.2d 341 (1989) (concluding that a statute prohibiting possession of stun guns does not impermissibly infringe upon a person's right to keep and bear arms for his own defense).

ports my belief that no fundamental right to possess an assault weapon exists.

In *Quilici v. Village of Morton Grove*, 695 F.2d 261, 268 (7th Cir.1982), *cert. denied*, 464 U.S. 863, 104 S.Ct. 194, 78 L.Ed.2d 170 (1983), the Court of Appeals for the Seventh Circuit determined that the Village of Morton Grove's gun control ordinance, which prohibited the possession of handguns within the village's border but did not prohibit the possession of all firearms, did not infringe on a constitutionally protected right. The court of appeals determined that the ordinance was properly directed at protecting the safety and health of Morton Grove citizens, was a valid exercise of Morton Grove's police power, and did not violate any of the appellant's rights guaranteed by the Illinois Constitution.[11]

In *State v. Brown*, 571 A.2d 816 (Me.1990), the defendant, a convicted felon, challenged the Maine statute that forbade him to possess firearms on the ground that it violated his state constitutional right to bear arms. The court determined that the state constitutional right to keep and bear arms is not an absolute right and the possession-by-a-felon statute does not exceed the permissible bounds of reasonable regulation under the state's constitutional police power.[12]

Furthermore, in the *Application of Atkinson*, 291 N.W.2d 396 (Minn.1980), the plaintiff, seeking to carry a loaded gun in his car while traveling on the public highways was denied issuance of a handgun permit. The Supreme Court of Minnesota determined that the state may reasonably exercise its police power to regulate the carrying of loaded weapons by individuals in the interest of public safety. The court further concluded that no absolute common-law constitutional right to carry weapons for individual self-defense exists.

In *People v. Kuri*, 132 Misc.2d 1036, 506 N.Y.S.2d 245 (N.Y.City Crim.Ct.1986), the court held that a provision of the New York penal law requiring that a person with a valid statewide pistol permit obtain a special permit to carry or possess a weapon within the city of New York is rationally related to the legislative goal of ensuring order in a densely populated high-crime area. In this case, the People asserted and the court agreed that the privilege of carrying a gun does not rise to the level of a fundamental right.[13]

In *Fresno Rifle and Pistol Club, Inc. v. Van de Kamp*, 746 F.Supp. 1415 (E.D.Cal. 1990), a case factually similar to ours, an action was brought challenging the validity of a California statute regulating the manufacture and transfer of assault weapons. The district court held that the statute violated neither rights conferred by the Second Amendment of the United States Constitution nor privacy rights guaranteed by the federal and California Constitutions.

Several courts have upheld firearms statutes against an equal protection challenge by applying a rational basis test since no fundamental right was affected.[14] In *Sklar v.*

---

**11.** Article I, § 22, of the Illinois Constitution reads: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed."

**12.** Article I, § 16, of the Maine Constitution states: "Every citizen has a right to keep and bear arms and this right shall never be questioned."

**13.** Article 2, § 4, of the New York Constitution, Civil Rights Law, states: "A well regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms cannot be infringed." N.Y.Civ.Rights Law art. 2, § 4 (McKinney 1992).

**14.** In framing the question as to whether the ordinance constitutes a reasonable exercise of the state's police power without engaging in a fundamental rights analysis, the majority relies

on a wealth of cases from other jurisdictions which are readily distinguishable on a procedural basis. A careful review demonstrates that in none of these cases, except for *Sklar v. Byrne*, discussed *infra*, did the trial court rule whether the right to bear arms is a fundamental right. Maj. op. at 330. These cases therefore provide limited support for the majority's proposition since the procedural postures of these cases differ significantly from the present case.

I am aware of no cases that have not engaged in a fundamental rights analysis where the trial court either determined whether the right to bear arms is a fundamental right or upheld the constitutionality of an ordinance regulating the right to bear arms. For example, in *Sklar v. Byrne*, 727 F.2d 633 (7th Cir.1984), the district court determined that the firearms ordinance does not infringe any federal constitutional right and therefore applied the rational basis standard of review

*Byrne,* 727 F.2d 633 (7th Cir.1984), the plaintiff brought a 42 U.S.C. § 1983 action challenging the constitutionality of a city firearms ordinance which prohibited the registration of handguns after a specified date. The court of appeals held that the handgun ordinance did not affect a fundamental right or suspect classification. Although the case was decided based on a federal equal protection analysis, the Seventh Circuit determined that a rational basis standard of review applied and, under such standard, the ordinance rationally furthered a legitimate governmental goal of protecting the safety of the city residents.

In response to the argument that the ordinance infringed upon a fundamental right guaranteed the plaintiff by the Illinois Constitution,[15] the court stated:

Examination of section 22 ... demonstrates that an individual's right to bear arms in Illinois is narrow and subject to extensive regulation. First, the individual's right to bear arms is expressly "subject" to the "police power." ... Second, the right is only a qualified right to bear some unspecified "arms" rather than a right to bear any particular type of firearm.... Since the state constitutional right is narrowly circumscribed by the police power, the fact that the Chicago ordinance as a whole affects the right does not

trigger compelling state interest analysis of the ordinance.

*Id.* at 637.

Similarly, *In re Application of Wolstenholme,* 1992 WL 207245 (Del.Super.1992), the court determined that a fundamental right to bear arms did not exist and a restriction or condition on a license to carry a concealed deadly weapon may be imposed without violating the applicant's right to substantive due process. The court concluded that the Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 20, of the Constitution of the State of Delaware [16] did not invalidate the court's authority to impose reasonable restrictions on a license to carry a concealed deadly weapon.

## C.

This court has had several occasions to review article II, section 13, and has never before determined that the right to bear arms is a fundamental right. The majority seizes on the litany of cases in our jurisdiction that have considered article II, section 13, in determining that "we have never found it necessary to decide the status accorded th[e] [right to bear arms]." Maj. op. at 328.

Contrary to the majority's assertion, we have specifically never reached this conclu-

to a non-fundamental right. Upon review, the Seventh Circuit addressed the appropriate standard of review of the ordinance's classification scheme and concluded that the ordinance withstands a rational basis review.

Similarly, in *Kalodimos v. Village of Morton Grove,* 103 Ill.2d 483, 83 Ill.Dec. 308, 319, 470 N.E.2d 266, 277 (1984), the Supreme Court of Illinois, in reviewing the constitutionality of a village ordinance prohibiting the possession of operable handguns, engaged in a fundamental rights analysis and determined that the rational basis test is the appropriate level of scrutiny where no fundamental right is involved. The circuit court upheld the constitutionality of the ordinance and therefore it was appropriate for the supreme court to determine whether a fundamental right was implicated.

Furthermore, in *Arnold v. City of Cleveland,* 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), the issue on appeal concerned the constitutionality of an ordinance which banned the possession and sale of assault weapons. The appellants challenged the ordinance as an overbroad restriction on their constitutional right to bear arms and de-

fend themselves and that the ordinance violates the Supremacy Clause of the federal Constitution. The court of common pleas ruled that the ordinance was constitutional. On appeal, the court of appeals concluded, *inter alia,* that the ordinance was a valid exercise of the state's police power and that the ordinance did not violate the right-to-bear-arms provision of the Ohio Constitution. The supreme court concluded that the right to bear arms is a fundamental right, but is not absolute and therefore the ordinance is subject to a reasonable exercise of police power.

**15.** Section 22 of the Illinois Constitution gives Illinois citizens the right to bear arms, but the constitution itself clearly limits that right, stating that, "[s]ubject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed."

**16.** This provision provides: "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use."

sion since the issue before us was never presented to this court in any of these cases. In *People v. Nakamura*, 99 Colo. 262, 62 P.2d 246 (1936),[17] and its progeny, the cases were resolved by subjecting the ordinances to a legitimate exercise of police power because whether the right to bear arms is a fundamental right was not at issue in any of these cases. We therefore did not need to nor did we reach whether a fundamental right was at stake given the procedural posture of these cases.

In construing this provision in the past, we have found that the right to bear arms is not absolute, *People v. Blue*, 190 Colo. 95, 544 P.2d 385 (1975), and have therefore analyzed constitutional challenges under the rational basis standard, that is, whether the regulation is a reasonable exercise of the state's police power.

In *City of Lakewood v. Pillow*, 180 Colo. 20, 501 P.2d 744 (1972), we invalidated a local ordinance that prohibited the possession, use, or carrying of all types of firearms outside of one's home. Although we indicated that the regulation of firearms "may be constitutionally subject to state or municipal regulation under the police power," we found that this absolute prohibition, which we read to prevent an individual from transporting a weapon from a gun store to his home, was too broad to be a legitimate exercise of that power. *Id.* at 23, 501 P.2d at 745. We did not need to determine whether the right to bear arms is a fundamental right because the trial court merely declared the ordinance invalid based "on its finding that the subject matter of the ordinance is a matter of statewide concern and is therefore preempted by a state statute pertaining to the carrying of a concealed weapon." *Id.* at 21–22, 501 P.2d at 744.

In *People v. Blue*, 190 Colo. 95, 544 P.2d 385 (1975), the defendants, convicted felons, argued that a statute prohibiting possession of weapons by previous offenders violated their constitutional right to bear arms. We reviewed the case based on the trial court's ruling that the statute was constitutionally overbroad and violated article II, section 13. We determined that the statute was a legitimate exercise of the state's police power. *Id.* at 104, 544 P.2d at 391. The statute, we said, did not conflict with the constitution merely because it limited the possession of weapons by persons likely to abuse such possession. In reaching this conclusion, we noted:

> We do not read the Colorado Constitution as granting an absolute right to bear arms under all situations. It has limiting language dealing with defense of home, person, and property. These limitations have been recognized by the General Assembly in the enactment of section 18–12–105, C.R.S. 1973, which restricts the right to bear arms in certain circumstances, while permitting in other circumstances the carrying of a concealed weapon in defense of home, person, and property, and also when specifically authorized by written permit.

*Id.* at 103, 544 P.2d at 391.

> The conflicting rights involved here are the individual's rights to bear arms and the state's right, indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people. . . .
>
> . . . [T]he state legislature cannot, in the name of the police power, enact laws which render nugatory our Bill of Rights and other constitutional protections.

*Id.* at 103, 544 P.2d at 390–91. In concluding that the statute constituted a legitimate exercise of the state's police power, again, we were not confronted with a ruling by the trial court that a fundamental right was implicated.

Further, in *People v. Ford*, 193 Colo. 459, 568 P.2d 26 (1977), the defendant was charged under a statute proscribing an offense of possession of weapons by previous offenders. The defendant contended that the statute's application to him was unconstitutional because it violated his right to keep and bear arms in defense of his "home, per-

---

17. We struck down a statute prohibiting unnaturalized foreign-born residents from keeping and bearing arms. It was not necessary for us to engage in a fundamental rights analysis since the trial court held that the statute was unconstitutional only.

son and property," as guaranteed by the Colorado Constitution, article II, section 13. We held:

> In *People v. Blue,* we recognized that the right to bear arms is not absolute; the Colorado Constitution limits that right to the defense of one's home, person, and property. Thus, statutes enacted pursuant to the state's police power may validly restrict or regulate the right to possess arms where the purpose of such possession is not a constitutionally protected one.

*Id.* at 462, 568 P.2d at 28 (citation omitted). In *Blue,* the trial court merely held that the statute violated the defendant's right to keep and bear arms without holding that the right to bear arms is a fundamental right.

Finally, in *People v. Garcia,* 197 Colo. 550, 595 P.2d 228 (1979), which involved a challenge to a statute which prohibited possession of a firearm by an intoxicated person, we found that the right to bear arms could be regulated by the reasonable exercise of police powers and that the rational relationship test was the appropriate standard of review. The case was before us based on the trial court declaring this statute to be unconstitutionally vague and overbroad. In holding that the statute "did not restrict the exercise of any fundamental right," we implicitly refused to recognize a fundamental right to bear arms. *Id.* at 553, 595 P.2d at 230.

In analyzing the Denver ordinance, I recognize that the right of individuals to bear arms under the Colorado Constitution is entitled to constitutional protection subject to government restrictions. Keeping the foregoing principles in mind from the above-cited cases, I conclude that Denver Ordinance No. 669 does not trammel a constitutional right. This court must therefore presume the statute's validity and accordingly use the rational basis standard of review.[18] I find the ordinance to be clearly reasonable and would uphold it as a valid exercise of the police power.

The statement of legislative intent contained in the ordinance provides:

> The city council hereby finds and declares that the use of assault weapons poses a threat to the health, safety and security of all citizens of the City and County of Denver. Further, the council finds that assault weapons are capable both of a rapid rate of fire as well as of a capacity to fire an inordinately large number of rounds without reloading and are designed primarily for military or antipersonnel use.
>
> The city council finds that law enforcement agencies report increased use of assault weapons for criminal activities. This has resulted in a record number of related homicides and injuries to citizens and law enforcement officers. It is, therefore, the intent of the city council to place reasonable and necessary restrictions on the sale and possession of assault weapons while placing no restrictions on the right of citizens to use weapons which are primarily designed and intended for hunting, target practice and other legitimate sports or recreational activities and the protection of home, person and property.

§ 38–130(a).

Thus, the city council's purpose in enacting Ordinance No. 669 is to protect the health and safety of the citizens of Denver by deterring the manufacture, sale, and possession of assault weapons, a class of weapons that the city council has determined presents a higher risk of danger to the public. In my view, the ordinance is a reasonable exercise of the municipality's police power to protect the citizens of Denver from violence stemming from the use of assault weapons.

The majority correctly concludes that Denver Ordinance No. 669 is constitutional: it is rationally related to a legitimate governmental interest and does not unreasonably restrict the exercise of the right to bear arms.

### III.

In my view, the appropriate analysis should have been an initial determination of whether the right to bear arms is a fundamental right and the applicable standard of

---

**18.** Legislation designed to protect the public's health and safety is entitled to a presumption of constitutionality. *People v. Unruh,* 713 P.2d 370, 373 (Colo.), *cert. denied,* 476 U.S. 1171, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986); *People v. Riley,* 708 P.2d 1359, 1362 (Colo.1985).

review. The majority's analytical framework does not follow modern established principles of constitutional review. While the majority and I differ in our constitutional analyses, I agree with the majority's conclusion that the Denver ordinance banning the manufacture, sale, or possession of assault weapons is constitutional. Furthermore, I believe that the right to bear arms is not a fundamental right.

Justice ERICKSON dissenting:

Lawrence Robertson, Sharon Deatherage, Jeffrey Hecht, and David Jewell, d/b/a Scotties Guns and Militaria, filed a declaratory judgment action to determine the validity of Denver Ordinance No. 669, codified at section 38–130 of the Denver Revised Municipal Code (ordinance). Subsequently, the attorney general intervened on behalf of the State of Colorado.[1] The district court, in determining cross-motions for summary judgment, considered affidavits and other evidence and held the ordinance to be unconstitutional on a number of grounds. As a result of this ruling, the district court entered summary judgment in favor of the plaintiffs. Subsequently, the City and County of Denver appealed.

On appeal, the issue of the validity of the ordinance centers on whether article II, section 13 of the Colorado Constitution prohibits the Denver City Council from imposing limitations on the use, manufacture, and possession of the firearms described in the ordinance as assault weapons. I agree with the majority that the General Assembly may regulate the manufacture, possession, and use of firearms that by proper and adequate definition are assault weapons. However, I agree with the attorney general that the City and County of Denver does not have the authority to regulate all firearms identified as assault weapons because the regulation is a matter of statewide concern. Accordingly, I respectfully dissent.

## I

The right to bear arms under the Second Amendment to the United States Constitution does not have any bearing or relevancy in resolving the issues before us. The federal law interpreting the Second Amendment is not helpful because the wording of the Federal Constitution differs materially from the wording of the Colorado Constitution. Therefore, federal law on fundamental rights under the United States Constitution does not assist us in our interpretation of the nature of the rights afforded by article II, section 13 of the Colorado Constitution.

In my view, the appropriate analysis requires a court to determine if a statute or ordinance regulating firearms is a legitimate exercise of the state's police power or is rationally related to some other governmental interest. In reviewing a statute or ordinance regulating firearms, a court must determine if it prohibits or abrogates legal activity or if it unduly infringes on an individual's right to bear arms. Accordingly, the trial court erred in applying an analysis based upon federal law relating to fundamental rights and subjecting the ordinance to strict scrutiny review.

## A

I agree with the majority that Colorado law is determinative on this issue. In *People v. Blue,* 190 Colo. 95, 103, 544 P.2d 385, 390–91 (1975), we recognized that regulation of firearms involves conflicting rights—the state's right pursuant to its police power to impose reasonable regulations for the purpose of protecting the health, safety, and welfare of its citizens and the individual's right to bear arms.

The appropriate inquiry when determining if an ordinance or statute regulating firearms is constitutional is whether the regulation is a "legitimate" exercise of the state's police power. *See People v. Garcia,* 197 Colo. 550, 553, 595 P.2d 228, 230 (1979). An act is within the state's police power if it is reasonably related to public health, welfare, or safety. *People v. Pharr,* 696 P.2d 235, 237 (Colo. 1984). In *Pharr,* we recognized that when

---

**1.** For simplicity, the plaintiffs and the plaintiff-intervenor are referred to collectively as "plaintiffs."

fundamental rights or suspect classifications are not involved, a statute will withstand constitutional challenge if it is rationally related to legitimate governmental interest. *Id.* Thus, the state may place reasonable limits on the right to bear arms granted by the Colorado Constitution. The trial court should have determined if the ordinance is reasonably related to public health, welfare, or safety or is rationally related to some other legitimate governmental interest.

Our prior cases provide substantial guidance in determining whether the ordinance in this case is a legitimate exercise of the state's police power. *Blue* establishes that any regulation of firearms must preserve the constitutional rights afforded by article II, section 13 of the Colorado Constitution:

> To be sure, the state legislature cannot, in the name of the police power, enact laws which render nugatory our Bill of Rights and other constitutional protections.

*Blue,* 190 Colo. at 103, 544 P.2d at 391.

As a threshold matter, it is clear that the General Assembly does not have the power to disarm the citizenry, or a class of citizens of the State. *People v. Nakamura,* 99 Colo. 262, 265, 62 P.2d 246, 247 (1936) ("The police power of a state cannot transcend the fundamental law, and cannot be exercised in such a manner as to work a practical abrogation of its provisions."). In *Lakewood v. Pillow,* 180 Colo. 20, 23, 501 P.2d 744, 745 (1972), we determined that a municipal ordinance that prohibited possession of a firearm outside of a residence was unconstitutional. We analyzed the ordinance by questioning whether it prohibited legal activity:

> An analysis of the foregoing ordinance reveals that it is so general in its scope that it includes within its prohibitions the right to carry on certain businesses and to engage in certain activities which cannot under the police powers be reasonably classified as unlawful and thus, subject to criminal sanctions. As an example, we note that this ordinance would prohibit gun-

smiths, pawnbrokers and sporting goods stores from carrying on a substantial part of their business. Also, the ordinance appears to prohibit individuals from transporting guns to and from such places of business. Furthermore, it makes it unlawful for a person to possess a firearm in a vehicle or in a place of business for the purpose of self-defense.

*Id.* at 20, 501 P.2d at 745. We have stated that *Pillow* "involved a broad prohibition [that] *unduly infringed* on the personal liberty of bearing arms." *Blue,* 190 Colo. at 104, 544 P.2d at 391. *Blue* addressed a statute that limited a felon's right to possess, use, or carry a firearm. In reviewing the statute, we noted the statute was constitutional in part because it "does not *abrogate* an ex-felon's right to legitimately use self-defense." *Id.* at 103, 544 P.2d at 391 (emphasis added).

These cases establish that in the context of regulating firearms, "legitimacy" has a specific meaning: firearms regulation is not a legitimate exercise of the state's police power if it prohibits or abrogates legal activity or unduly infringes on an individual's right to bear arms. If this narrow definition of legitimacy is not recognized, almost any law regulating firearms could be justified as a reasonable exercise of the state's police power in protecting the public health, safety, and welfare.

### B

Historically, our General Assembly has regulated possession of firearms that are designed to inflict serious bodily injury or death in either warfare or in violation of the criminal laws.[2] Section 18–12–102, 8B C.R.S. (1986 & 1993 Supp.), provides:

> Possessing a dangerous or illegal weapon—affirmative defenses.
>
> (1) As used in this section, the term *"dangerous weapon" means* a firearm silencer, *machine gun, short shotgun, short rifle,* or ballistic knife.

2. In addition, the General Assembly has passed legislation that: provides affirmative defenses to the charge of carrying a concealed weapon, § 18–12–105, 8B C.R.S. (1986); creates a mechanism for a citizen to obtain a permit to carry a concealed weapon, § 18–12–105.1, 8B C.R.S. (1986); allows a resident to purchase a firearm out of state, § 12–27–102, 5A C.R.S. (1991); and regulates the sale of firearms, §§ 12–26–101 to –104, 5A C.R.S. (1991).

(2) As used in this section, the term "illegal weapon" means a blackjack, gas gun, metallic knuckles, gravity knife, or switchblade knife.

(3) A person who knowingly possesses a dangerous weapon commits a class 5 felony. Each subsequent violation of this subsection (3) by the same person shall be a class 4 felony.

(4) A person who knowingly possesses an illegal weapon commits a class 1 misdemeanor.

(5) It shall be an affirmative defense to the charge of possessing a dangerous weapon, or to the charge of possessing an illegal weapon, that the person so accused was a peace officer or member of the armed forces to the Unites States or Colorado nation guard acting in the lawful discharge of his duties, *or that said person has a valid permit and license for possession of such weapon.*

(Emphasis added.) Section 18–12–101, 8B C.R.S. (1986), defines: "machine gun" as "any firearm, whatever its size and usual designation, that shoots automatically more than one shot, without manual reloading, by a single function of the trigger"; "short rifle" as "a rifle having a barrel less than sixteen inches long or an overall length of less than twenty-six inches"; and "short shotgun" as "a shotgun having a barrel or barrels less than eighteen inches long or an overall length of less than twenty-six inches."

In my view, manufacture, possession, and use of firearms that by proper definition are assault weapons may also be regulated under the state's police power.[3] The General Assembly may regulate assault weapons if the regulation does not prohibit or abrogate legal activity or unduly infringe on an individual's right to bear arms.

### III

The majority notes: "This case presents questions of whether an ordinance banning the manufacture, sale, or possession of 'assault weapons' within the City and County of Denver violates article II, section 13 of the Colorado Constitution. . . ." Maj. op. at 3. Encompassed in this issue is whether the City and County of Denver has the authority to regulate firearms.[4] Although the General Assembly has the power to regulate assault weapons, every hamlet and home-rule city does not have the same power. Local governments should not have a separate and different legislative definition, penalty, and

3. The General Assembly has specifically addressed the issue of "assault weapons." In the 1989 session, the General Assembly refused to enact legislation criminalizing the possession of assault weapons by law-abiding persons. Hearings on S.B. 248 Before the Senate Judiciary Committee, 57th Gen. Assembly, 1st Reg.Sess. (audio tape, April 26, 1989, at 2:39–3:44). The General Assembly has addressed assault weapons by enacting § 16–11–309(8), 8A C.R.S. (1993 Supp.), which provides:

(a) In any case in which the accused is charged with a crime of violence as defined in this section and the indictment or information specifies the use of a "dangerous weapon" as defined in section 18–12–101 and 18–12–102, C.R.S., or the use of a semiautomatic assault weapon as defined in paragraph (b) of this subsection (8), upon conviction of said crime of violence, the judge shall impose an additional sentence of five years for use of such weapon. The sentence of five years shall be in addition to the mandatory sentence imposed for the substantive offense and shall be served consecutively to any other sentence and shall not be subject to suspension or probation.

(b) For purposes of this subsection (8), "semiautomatic assault weapon" means any semiautomatic center fire firearm that is equipped

with a detachable magazine with a capacity of twenty or more rounds of ammunition.

4. Although the issue of preemption is raised in the plaintiffs' answer brief and was addressed by the district court in its order granting the motion for summary judgment, the plaintiffs did not file a cross-appeal. In my view, the issue should be addressed. We have discretionary authority under C.A.R. 1(d) to notice errors not properly preserved or raised, especially when they are of constitutional importance. *See Moses v. Diocese of Colorado,* 863 P.2d 310, 319 n. 10 (Colo.1993) (reviewing First Amendment issue not properly preserved in the trial court); *Schuster v. Zwicker,* 659 P.2d 687, 690 (Colo.1983) (recognizing discretionary authority to correct a fundamental error); *Patterson v. Cronin,* 650 P.2d 531, 535 n. 9 (Colo.1982) (noting that the court was not precluded from addressing a due process argument although it was not ruled on by the court below because it was raised in the pleadings); *Robinson v. People,* 173 Colo. 113, 116, 476 P.2d 262, 263 (1970) (addressing a question not raised in the trial court because the issue was of constitutional proportions).

proscription against the manufacture, use, and possession of so-called assault weapons. In my view, local regulation of firearms is an undue infringement on the right to bear arms under the Colorado Constitution and is preempted by state law.

The City and County of Denver is a home-rule city created under article XX of the Colorado Constitution. As such, Denver may exercise only those powers granted by the state constitution. Article XX of the Colorado Constitution grants home-rule cites "the full right of self-government in both local and municipal matters." Colo. Const. art. XX, § 6; *see also City & County of Denver v. Colorado River Water Conservation Dist.,* 696 P.2d 730, 740 (Colo.1985); *Four–County Capital Metro. Improvement Dist. v. Board of County Comm'rs,* 149 Colo. 284, 294, 369 P.2d 67, 72 (1962).

If a matter is of statewide concern, a home-rule municipality is precluded from acting. *City & County of Denver v. State,* 788 P.2d 764, 767 (Colo.1990); *see also Colorado River Dist.,* 696 P.2d at 740 ("In matters of purely statewide concern, and in the absence of a grant to the city of specific power by the constitution or by state statutes, the General Assembly is free to adopt legislation, and the city is without power to act at all.").

The basis of the prohibition on local action in matters affecting the entire state is that uniformity of regulation is advantageous:

> The central inquiry implicit in the concept of pre-emption is whether there should be statewide uniformity in the regulation of specific conduct. If there is no need for statewide uniformity, there is no need for state law to preempt local power to regulate.... This is the core of the preemption question—to consider, on the one hand, the need for statewide uniformity of regulation of a specific type of conduct, and, on the other hand, the need of local governments to be able to respond to local, as distinguished from statewide, problems.

Daniel R. Mandelker & Dawn C. Netsch, *State and Local Government in a Federal System* 237 (1977); *see also* Osborne M. Reynolds, *Local Government Law* 120 (1982) (stating that the critical inquiry in the context of state preemption of local law is: "[I]s

this an area where it is desirable to have a single, all-encompassing scheme of regulation, so that local laws—not just local laws that conflict with the state's, but *any* local laws—would unduly complicate the picture?"); Charles S. Rhyne, *The Law of Local Government Operations* § 19.11 (recognizing that preemption rooted in the necessity of statewide uniformity of regulation).

The determination of whether a matter is of statewide concern is not subject to a strict legal standard; instead, we have made such determinations on an ad hoc basis, taking into account the facts of each case. *Denver & Rio Grande Western R.R. Co. v. City & County of Denver,* 673 P.2d 354, 358 (Colo. 1983). In *City & County of Denver v. State,* 788 P.2d 764, 767 (Colo.1990), we stated:

> Although we have found it useful to employ the "local," "mixed," and "state-wide" categories in resolving conflicts between local and state legislation, these legal categories should not be mistaken for mutually exclusive or factually prefect description of the relevant interests of the state and local governments. Those affairs which are municipal, mixed or of statewide concern often imperceptibly merge.

The best determinate of what is a statewide concern is our prior decisions.

We have held that regulation is solely a matter of statewide concern in a broad range of factual circumstances. *See City of Colorado Springs v. Industrial Comm'n,* 749 P.2d 412 (Colo.1988) (unemployment compensation); *Century Elec. Serv. & Repair, Inc. v. Stone,* 193 Colo. 181, 564 P.2d 953 (1977) (licensure of electricians); *City & County of Denver v. Public Utilities Comm'n,* 181 Colo. 38, 507 P.2d 871 (1973) (rates of privately owned public utilities inside a municipality); *City & County of Denver v. Thomas,* 176 Colo. 483, 491 P.2d 573 (1971) (workmen's compensation); *Public Utilities Comm'n v. Durango,* 171 Colo. 553, 469 P.2d 131 (1970) (rates of municipally-owned public utility outside municipality); *Kelly v. City of Fort Collins,* 163 Colo. 520, 431 P.2d 785 (1967) (liquor regulation); *Denver v. Sweet,* 138 Colo. 41, 329 P.2d 441 (1958) (income tax); *City of Canon City v. Merris,* 137 Colo. 169, 323

P.2d 614 (1958) (driving under the influence); *Ray v. City & County of Denver,* 109 Colo. 74, 121 P.2d 886 (1942) (regulation of small loans); *Hilts v. Markey,* 52 Colo. 382, 122 P. 394 (1912) (powers of county officers).

The regulation of firearms is a subject for state, not local, regulation. *See Doe v. City & County of San Francisco,* 136 Cal.App.3d 509, 186 Cal.Rptr. 380, 385 (1982) (holding that where state law does not require a permit for a firearm, the state law preempts local ordinance requiring registration of existing handguns and prohibiting new handguns); *Dwyer v. Farrell,* 193 Conn. 7, 475 A.2d 257, 261 (1984) (holding that the local ordinance was preempted because, "by placing these restriction on the sale of handguns, the ordinance effectively prohibits what the state statues clearly permit"); *Montgomery County v. Atlantic Guns,* 302 Md. 540, 489 A.2d 1114, 1114 (1985) (holding that state law preempted a local ordinance that restricted ammunition sales); *Duff v. Township of Northampton,* 110 Pa.Cmwlth. 277, 532 A.2d 500, 506 (1987) (holding that a state law permitting firearm discharge preempted an ordinance restricting discharge), *aff'd,* 520 Pa. 79, 550 A.2d 1319 (1988); *Schneck v. City of Philadelphia,* 34 Pa.Cmwlth. 96, 383 A.2d 227, 229–30 (1978) (deciding ordinance requiring police permit for firearm purchase was preempted because state law did not require a permit); *Cherry v. Municipality of Metro. Seattle,* 116 Wash.2d 794, 808 P.2d 746, 748 (1991) (recognizing that state legislature intended to preempt city, town and county firearms laws).

A patchwork of conflicting municipal regulations will not serve the interests of the state, and local attempts to regulate firearms, in my opinion, are prohibited by article II, section 13 of the Colorado Constitution. Owners of firearms who desire to hunt, target shoot, or pursue other lawful recreational activity in different parts of the state could be subject to a wide range of criminal penalties in different cities or towns if the definition of an assault weapon is not uniform and subject to clear definition.

In my view, if preemption is not applied, and every home-rule city or town is permitted to regulate assault weapons, a network of conflicting ordinances will be created that have no uniformity and will invite further litigation on the scope of the right to bear arms. The variation in the definitions, proscriptions, and penalties for the possession, use, or manufacture of assault weapons would be an undue infringement on the rights of the citizens of Colorado and therefore would be an unreasonable exercise of the state's police power.

## IV

I agree with the majority that the right to bear arms under article II, section 13 of the Colorado Constitution is subject to regulation. Although I agree with the general analysis applied by the majority, the majority concludes that if an ordinance regulating firearms is governed by a reasonable state interest, the ordinance is constitutional. This standard is overly broad and should be limited to preserve the constitutional rights set forth in article II, section 13 of the Colorado Constitution. The validity of a firearms regulation as a legitimate exercise of the state's police power is determined by whether the regulation prohibits or abrogates legal activity, or unduly infringes on an individual's right to bear arms. In my view, the trial court erred in applying federal law to conclude that a fundamental right was at issue which required strict scrutiny review. Instead, the trial court should have applied the standards that are derived from our prior cases.

Although I agree with the majority that the state has the authority to regulate firearms that by proper and adequate definition are assault weapons, the City and County of Denver does not have this power. In my view, the ordinance violates article II, section 13, and article XX of the Colorado Constitution. Therefore I would affirm the ruling of the trial court finding the ordinance unconstitutional. Accordingly I dissent.